·NEW-YORK,
Sept. 1830.

THE CANAL COMMISSIONERS and THE CANAL APPRAISERS *vs.* THE PEOPLE, on the relation of George Tibbits.

Canal Com-
missioners
v.
The People.

George Tibbits claimed to be the owner of a valuable *water fall* in the *mid-
dle sprout* of the Mohawk river, which, in consequence of the erection of
the dam in the Hudson immediately above *Troy* for the purpose of improv-
ing the navigation of the latter river, is overflowed and rendered useless;
and for the injury sustained by him in the destruction of the fall, he requir-
ed his damages to be appraised, and paid by the state. The canal apprais-
ers refused to appraise the damages, on the ground assumed by them that
he had not shewed title to the premises. The supreme court, after a rule
to shew cause, &c. issued a *peremptory mandamus,* and the commissioners
and appraisers sued out a *writ of error.* The court for the correction of er-
rors, by a vote of 20 to 5, decided that from the facts of the case it *did not
appear* that the *middle sprout* was embraced within the grant of the manor
of *Rensselaerwyck,* by title under which the relator claimed the premises.*

ERROR from the supreme court. At the October term,
1826, of the supreme court, the relator George Tibbits obtain-
ed a rule that the canal commissioners and canal appraisers
shew cause why a *mandamus* should not issue, commanding
them to assess, appraise, allow and pay certain damages al-
leged to have been sustained by him in consequence of the

_____

* This case in itself, as simply presenting the question of the construction
of a grant, would not have justified the occupying the space it does in these
reports; but involving a principle of immense magnitude in its results, both
as it regards the *interests of individuals* and the *rights of the public,* as to the
application of the rule of the common law to *grants bounded on rivers above
tide water,* it has been deemed that a more acceptable service could not be
rendered than by giving a full report of the case, notwithstanding its length.
The principles on this point advanced by the members of the court cannot,
however, be considered as established by the determination of the court, as
the decision of the case wholly proceeded on the ground that the relator had
failed to shew title to the premises injured.

The following is a brief abstract of some of the principles advanced in the
opinions delivered :

" The rule of the *common law* prevails here, that grants of lands bounded
on rivers and streams *above tide water* extend *usque filum aquœ,* and that not
only the *banks,* but the *beds* of the rivers, and the *islands* therein, and the
exclusive right of *fishing* pass to the grantee, unless they are expressly re-
served, or the terms of the grant be such as to shew a clear intention to ex-
clude them from the operation of the rule of law." Per Chancellor WAL-
WORTH and Senator ALLEN.

NEW-YORK, erection of the dam across the Hudson, at the *sloop lock* be-
Sept. 1830. tween Troy and Lansingburgh, by means whereof the water
Canal Com- is raised to the perpendicular height of *nine feet*, in a *sprout*
missioners in the Mohawk river called the *middle sprout*, situate above
v.
The People. the dam and between two large islands in the Hudson river,
known as Green Island and Van Schaick's Island, and a *wa-
ter fall* of twelve feet is destroyed and rendered useless. The
relator claimed to be the owner of the land under the water
in the sprout, deriving title to the same under a conveyance
from Stephen Van Ransselaer to Jacobus Van Schoonhoven,
bearing date 5th May, 1792, and under sundry mesne con-
veyances; he alleged that the *tide had never ebbed or flowed*
in the middle sprout and that the sprout had *never been navi-
gable* until the erection of the dam across the Hudson; that
he had applied to the appraisers under the *canal laws* to have
his damages assessed, produced legal proof of his title and of
the injury sustained by him by means of the premises; that
the appraisers had refused to assess or allow any damages to
him, assigning as the reason of such refusal that he had no le-

---

"The right of the riparian owner to the stream itself, however, is not *abso-
lute* if the stream be *navigable*; in such case, the right of the *owner* is subject
to the right of *the public*, to use the waters as a *highway* for the passage of
boats, &c., and in conformity with this principle, the legislature declare
certain waters public highways, regulate the building of dams," &c. Per
Chancellor WALWORTH and Senator ALLEN.

"The state has not the right, *without making compensation*, to destroy the
property of individuals situate upon rivers above tide water *in making waters
navigable* which are not so by nature, or in *appropriating such waters to the
public use* by artificial erections or improvements." Per Chancellor WAL-
WORTH and Senator ALLEN.

"The principle of the common law extending grants, *usque filum aquæ*, is
not sufficiently broad to embrace our *large fresh water lakes*; as to those our
*local law* assigns the shores down to ordinary low water mark to the riparian
owners, and the *beds* of the lakes with the *islands* therein to the public." Per
Chancellor WALWORTH.

"The permanent *overflowing* of a water fall, in the construction of public
works, is an appropriation of the same to the public use, and the owner is en-
titled to compensation." Per Chancellor WALWORTH and Senator ALLEN.

"The rule of the common law extending grants, on the shores of rivers
above the flow and reflow of the tide *usque filum aquæ* does not apply to our
*large fresh water rivers*; at all events, a patent bounded on a river *navigable
above tide water* passes no interest to the patentee in the bed of the river as
against the state." Per Senator BEARDSLEY.

gal claim to the land under the water in the middle sprout, *alleging that it belonged to the people of the state;* that he had appealed from such decision to the canal commissioners who had affirmed the same upon the grounds assumed by the appraisers.

At the February term, 1827, *Samuel Young* and *David Woods,* two of the appraisers, *shewed for cause,* that it had been required by the appraisers as an indispensable preliminary that every applicant for damages should shew title to the premises upon which the damages are claimed to have been done; that in pursuance of this requisition, the relator on his application for damages made an exhibition to them of conveyances by which it appeared that he claimed title to the middle sprout of the Mohawk river under the patent of Rensselaerwyck, an exemplified copy of which patent was produced by him as a necessary link in his chain of title; that the patent for the manor of Rensselaerwyck bears date 20th May, 1704, and grants "All that and those tract and tracts of land called Rensselaerwyck, lying and being in and upon the Banks of Hudson's River aforesaid, in the County of Albany, in the province of New-York aforesaid, theretofore called and known by the name ye Colony of Rensselaerwyck, beginning at the south end or part of Berrein Island, on Hudson's River aforesaid, and extending northward up along both sides of ye said river unto a place theretofore and yet called the Kahoos or Great Falls of ye said River, *and extending itself east and west all along from each side of the said River backwards* into the woods twenty-four English miles,————with all and singular the rights, members and appurtenances of the said tract and tracts of land and of every of them, and all and singular the messuages, lands, tenements, houses, milnes, plantations, buildings, orchards, gardens, meadows, pastures, feedings, commons, woods, underwoods, rents, arrearages of rents, services, waifs, estrays, royaltyes, libertyes, privileges, jurisdictions, hereditaments, and all other the rights, members and appurtenances, whatsoever, to all and every the said tract and tracts of land and premises belonging and appertaining, or accepted, reputed,

taken, known, or occupied as part, parcel, or member there-
of; together with all and every the isles, islands, rivers,
creeks, runs of water, mines, mineral, (royal excepted,) fish-
ings, fowlings, huntings, hawkings and all other royalties,
powers, franchises, harbors, profits, commodities and here-
ditaments, whatsoever, to the said premises or any part
thereof belonging or appertaining." That after carefully
examining the patent with their knowledge of localities they
were clearly of the opinion, that the middle sprout of the
Mohawk is not embraced within its boundaries, and that the
relator had entirely failed to make out any title to the middle
sprout. They further shewed for cause, that among the
conveyances exhibited by the relator was a deed from Gen-
eral Stephen Van Rensselaer, the present proprietor of the
patent of Rensselaerwyck, to Jacobus Van Schoonhoven,
bearing date the 5th May, 1792. The history of which con-
veyance, as obtained verbally from General Van Rensselaer,
is as stated by them in substance as follows :—Jacobus Van
Schoonhoven had made application to the said Stephen Van
Rensselaer, for a conveyance to him of the premises men-
tioned in the said deed, and was informed, that he, the said
Stephen, did not consider the same as included within his
patent. After repeated solicitations, however, the said Ste-
phen consented to release, by a quit claim deed to the said
Jacobus, all the right and title of him the said Stephen,
to the said premises, without any consideration whatever.
Some time afterwards the said Jacobus, presented to the
said Stephen for execution, a deed in fee, of the said premi-
ses with a covenant of warranty, which the said Stephen
refused to execute. On its being suggested, however, that
the covenant of warranty might be cancelled by a release,
executed by the said Jacobus, to the said Stephen simulta-
neously, with the execution of the deed, this arrangement
was adopted, and the deed and release of the covenant of
warranty were mutually executed and delivered by the par-
ties. No consideration was claimed by the said Stephen or
paid by the said Jacobus. The appraisers then submit an
argument to the court, the object of which was to shew
that the bed of the *Hudson* and *Mohawk* rivers had never

been granted to individuals, but that the *fee* of the same re-
mained in the state. They aver that the original patents are
bounded on those rivers, and that there is but a single case
in which any part of the bed of those rivers has been grant-
ed by patent, which is a patent to one *Henry Stilson* of two
acres in the bed of the Hudson at *Fort Miller falls*, on the
west side of the river, adjoining to the *Kayaderosseras* patent
for hydraulic purposes; and they argue if the Kayaderosseras
patent is by construction to extend *ad filum aquœ*, the grant
to Stilson was void. They also advert to the acts of the le-
gislature from time to time in granting islands in rivers; in
authorizing the construction of dams; in granting lands un-
der water in the lakes for building docks and wharves, to
shew that the common law doctrine of *ad filum aquœ*, was not
recognized here as applicable to grants of land adjoining riv-
ers. The court granted an *alternative mandamus*.

At the May term, 1827, of the supreme court, *Stephen Van
Rensselaer*, one of the *canal commissioners*, and *Joseph D. Sel-
den*, one of the *appraisers*, severally made returns to the al-
ternative mandamus; the other commissioners and appraiser
making no return whatever. Mr. Van Rensselaer returned
that he had been informed and believed that the relator
founds his claim to the premises for which he demands com-
pensation from the state under a release, which he, as pro-
prietor of the manor of Rensselaerwyck, executed to Jaco-
bus Van Schoonhoven, Esq. deceased, several years since;
thereby releasing and conveying to the said Jacobus Van
Schoonhoven, his heirs and assigns, all the right, title and in-
terest which he then had in and to the premises, with the
privileges and appurtenances described in the said release;
and that the said Jacobus Van Schoonhoven, some time af-
terwards, in due form of law, released him from the cove-
nant of warranty, which had by mistake or inadvertence
been inserted in the said release; and he further certified
that he had taken no part as a canal commissioner or ap-
praiser in any of the proceedings relating to the claim of the
relator. Mr. Selden returned that, after the relator gave to
Samuel Young, David Woods and himself notice of his claim
for damages, the appraisers met and formed a board for the

purpose of settling the claim, when a majority of the board adjudged and determined that the claimant's title was not sufficiently substantiated to entitle him to damages; on which subject he differed in opinion with the rest of the board, and believed now, as he did then, that the relator has a legal and equitable claim for damages; and furthermore, that he is ready and willing to make an estimation and appraisal of the said damages as the court shall direct.

On the coming in of these returns, the supreme court ordered a *peremptory mandamus.* The reasons of the court will be found in the decision of a similar case, *Ex parte Jennings,* 6 *Cowen,* 518, in a note to which at page 551 is a brief mention of this case. To review the decisions of the supreme court awarding the *writs of mandamus* in this case, a writ of error was sued out to this court by the canal commissioners and the canal appraisers.

*H. Bleecker & S. Young,* for the plaintiffs in error. The assessment and payment of damages claimed by the relator are not authorized by any act of the legislature. By the ' act respecting navigable communications between the great western and northern lakes and the Atlantic ocean,' *Laws of 1817, p. 301,* the canal commissioners are authorized to *enter upon, take possession of* and use all and singular any lands, waters and streams necessary for the prosecution of the improvements intended by the act; and by the same section provision is made for the appraisement of loss and damage sustained by the owners of property taken for such purposes; and it is made the duty of the appraisers to describe in a book the several *premises appropriated* by the canal commissioners, and upon so doing the *fee simple* of the *premises so appropriated* vests in the state. Here no property has been *entered upon* and *taken possession of;* no premises have been *appropriated,* the fee of which could vest in the state. Nothing has been taken from the relator of which he was in the *actual* enjoyment and use; and the damage, if any he has sustained, is incidental and not provided for by the act.

The relator has no title to the premises. The manor of *Rensselaerwyck* is described as beginning at a certain island

in the Hudson and extending northward *up along both sides*
*of the river* unto a place called the *Cahoes* or great falls, and
extending itself east and west all along *from each side of the*
*river* backwards into the woods 24 miles.   In this grant the
river is *not* included; on the contrary, the grant is *exclusive*
of the river.   In *Cortelyou* v. *Van Brundt,* 2 *Johns. R.* 362,
where a patent was described as *stretching along the bay,* it
was said by the court, the rule of the common law carries it
down to ordinary high water mark—See also 5 *Wheaton,*
374.   In *Hatch* v. *Dwight and others,* 17 *Mass. R.* 289, Par-
ker, C. J. says, "The land released is limited to *the bank* of
the stream, which necessarily excludes the stream itself.
Without doubt the owner of land extending to the bank of a
river will own to the middle of the river if it be not navigable
and so public property; but the owner may sell the land
without the privilege of the stream, as he will if he bounds
his grant *by the bank.*"   Besides, it does not appear from any
evidence in the case that a construction has been given to
the patent by which the rivers or the islands therein have been
claimed to pass by the grant.   On the contrary, it would
seem that the present proprietor of the patent has stated that
previous to his conveyance to Van Schoonhoven, he told him
that he did not consider the premises in question as included
within his grant.

The relator, previous to the erection of the dam, had no
mills or other hydraulic works at his falls and made no use
of the waters, and the state by *prior occupancy* gained the
better right.   "The elements," says C. J. Thompson in *Platt*
v. *Root,* 15 *Johns. R.* 216, "being for general and public use,
and the benefit of them appropriated to individuals *by occu-
pancy only,* this occupancy must be regulated and guarded
with a view to the individual rights of all who may have an
interest in their enjoyment."   If a stream of water is unoc-
cupied, a person may erect a mill thereon and detain the wa-
ter, yet not so as to injure his neighbor's *prior* mill; for he
has, by the *first occupancy,* acquired a property in the cur-
rent, 2 *Black. Comm.* 403; but if *after* a man has erected a
mill, another should erect a mill *above* which would be in-
jured by *back water* caused by the dam first built, the owner

of the mill above would have to submit to the injury, and would have no right to complain. *Angell on Water Cours-es*, 69, *and appendix*, 74. In the language of Chancellor Kent, "it would be like the case of a man building his house against an ancient wall, and then complaining that his win-dows were darkened." 3 *Johns. C. R.* 282. In further sup-port of this position, the counsel cited 6 *East*, 218; 9 *Co.* 113; 2 *Black. Comm.* 18; *Barn. & Ald.* 258; 17 *Mass. R.* 289; *Angell on Water Courses*, 39, *et seq.*; *Vattel, lib.* 1, *ch.* 20, § 250; *Paley's Moral Philosophy*, 66, 67. If, then, the relator would have had no right to complain had the dam in question been erected by an individual for hydraulic purpos-es and for his private benefit, *a fortiori* is he precluded from complaint, the dam being erected for public purposes and for the benefit of the community at large ?

*Sir Matthew Hale* in his treatise *de jure maris, Hargrave's Law Tracts*, 6 *Cowen*, 537, *note*, lays down the following rule: "Fresh rivers of what kind soever do of common right belong to the owners of the soil adjacent; so that the owners of the one side have of common right the *propriety* of the soil, and consequently the right of fishing, *usque filum aquæ ;* and the owners of the other side the right of soil or ownership and fishing unto the *filum aquæ* on their side. And if a man be owner of the land of both sides *in common presumption* he is owner of the whole river, and hath the right of fishing according to the extent of his land in length—with this agrees the common experience. But special usage may alter that *common presumption*, for one man may have the river and others the soil adjacent; or one man may have the river and soil thereof and another the free or several fishing in that river." This is the text on which the claim of the relator is founded, and which governed the decision of the supreme court. It will be observed that it is a rule by which the conflicting rights of *individuals* are settled, and those rights principally relating to *fishing*, and that the rights or *interest of the public* are not considered, and most proba-bly were not intended to be passed upon. Again, it will be noticed that the right of the owner of land of both sides of a river to the river itself is placed on the ground of *presump-*

*tion,* which it is admitted may be altered by special usage. If usage can destroy the presumption, what effect shall be given to the assertion of rights of sovereignty over rivers thus situated, by express grants from the state ? What foundation for a presumption is left in such cases ? The doctrine of presumption of grants is convenient, perhaps necessary, in an old country like England, where, in many instances, most probably grants were never made, but yet possessions have been continued in families for time immemorial; there, for the quieting of possessions and the prevention of controversies the application of such doctrine is wise and salutary. With us no such necessity exists; here property is held legitimately only by grant, and our records being all extant, the doctrine of presumption, though it may be applied as between *individuals,* cannot with propriety be indulged as against the state, because what the state has granted appears by the records, and no presumption can be admitted against those records.

At the conclusion of his first chapter, *de jure maris,* Hale says, " though fresh rivers are in point of propriety as before *prima facie of a private interest,* yet as well fresh rivers as salt, or such as flow and re-flow, may be under these two *servitudes,* or affected by them: viz. one of *prerogative* belonging to the *king,* and another of *public interest,* or belonging to the people in general." All the *prerogatives* of the crown consistent with our constitution and policy belong to the people. One of which was to *reform* obstructions or annoyances in rivers whether fresh or salt, that were a common passage, *de jure maris,* ch. 2. This prerogative is constantly exercised by the state; under it the dams in the *Hudson,* and the dams and aqueducts on the *Mohawk* were erected to improve the navigation and facilitate the common passage. If the rivers and the land under the waters of those rivers belonged to the owners of the adjacent shores, what right had the state to build those dams and aqueducts? The answer is, that those rivers are subject to the *servitudes* above enumerated, and that the rights of individuals must yield to the *prerogative* of the people and to the *public interest.* What

NEW-YORK,
Sept. 1830.

Canal Com-
missioners
v.
The People.

then is the law of England on this subject? It is that to pro-
mote the grand ends of civil society it assigns to every thing
capable of ownership a legal and determinate owner, and
therefore to the owner of the adjacent shores of a river it as-
signs the river and the bed thereof, *subject, however, to the
prerogative of the people and the public interest.*

All rivers that can be used as *highways,* so far as the *puc-
lic use* is concerned, *belong to the public,* both here and in Eng-
land. If a measure be adopted to improve the navigation of
*one* river to advance the public use, can an individual have
such a property in *another* river as to be entitled to compen-
sation for an injury produced by the improvement? Suppose
that the removal of an obstruction in a river should produce
a diminution in the waters of a tributary stream, would an
individual owning the shores of such stream be entitled to
compensation? If he would, it is manifest that the Eng-
lish rule stands in the way of public improvement of streams
and rivers. This is not the law, either in England or here.
Whenever the *private rights* of individuals interfere with pub-
lic convenience, they must give way. *Comyn's Dig. tit.
Pleader* 3, *M.* 37. It cannot be doubted that the state has
the right to *improve the navigation* of a river obstructed by a
fall, by destroying the fall by a dam or otherwise, and thus
prevent the necessity of a *carrying place.* The Hudson river
was a public highway, and the state had the right to improve
its navigation by the erection of the dam, although it produ-
ced the injury complained of. An owner of the shores of
the Hudson could not use the water or erect any works in
the river interfering with the public use thereof by naviga-
tion; nor can the owner of the shores of the Mohawk, by
any works erected on it, interfere with the navigation of the
Hudson: in either case, such erections would be nuisances.
Hale *de jure maris, ch.* 3, says: "All nuisances and impedi-
ments of passages of boats and vessels, though in the private
soil of any person, may be punished by indictments, and re-
moved." He enumerates as nuisances wears, piles, choak-
ing up the passage with filth, diverting of the water by cuts
or trenches; thus laying down the rule that in regard to riv-
ers, private rights must yield to public convenience—water

cannot be diverted—the public use cannot be interrupted. If the navigation of the *Hudson* required the water of the middle sprout, the relator could not use it; and where is the difference if such navigation required the destruction of his fall in the middle sprout? The improvement in the navigation of the Hudson could not be made without doing the injury complained of. In *Hooker* v. *Cumming*, 20 *Johns. R.* 101, Chief Justice *Spencer* says: "I concur in the doctrine that all rivers, in fact navigable, whether above the flow of the tide, or whether in their whole extent unaffected by the tides, *in reference to the use of them are public*, and subservient to public accommodation, and liable to governmental regulation." If this be a correct exposition of the law, then all private interests in waters must be subject to such governmental regulation for the public use; and being so *subject*, there can be no claim for compensation for injury to such rights. The general act, 2 *R. L.* 285, declaring certain waters to be public highways, shews the sense of the legislature, that what are deemed *private rivers* in England are here considered subject to the regulation of the public authority; and that of course the rights of the owners of the adjacent shores are subservient to the public use. In *Palmer* v. *Mulligan*, 3 *Caines*, 312, *Spencer*, J. speaking of the Hudson river, says: "I cannot but consider it a common highway, *independent of its being navigable* with small craft and rafts above the place in dispute. The legislature have constantly considered this river as *public and common to all the citizens of the state* above tide water; they have granted lands in this river at *Glen's Falls* and in the town of *Greenwich*." The case of *Palmer* v. *Mulligan* was an action by the owner of a dam against his neighbor for diversion of water by the erection of another dam, both dams being erected in the Hudson river; and *Spencer*, J. observes: "If the river is to be deemed a highway, *the erection of both dams are nuisances*." How could they be *nuisances*, unless the river was *public* in the sense of a navigable river in England? In *Shaw and others* v. *Crawford*, 10 *Johns. R.* 236, speaking of rivers so far navigable as to be of public use in the transportation of property, the court say:

NEW-YORK,
Sept. 1830.

Canal Com-
missioners
v.
The People.

"The public claim to such navigation ought to be liberally supported. The free use of waters which can be made subservient to commerce has, by the general sense of mankind, been considered as a thing of common right. Individuals who occupy the adjoining banks may use the waters for their own emolument, so far only as it can be done without any material interruption of the public use." The conclusion, therefore, is, that *on the principle of the English law*, the improvement of the navigation could be made without subjecting the state to the payment of damages to the relator.

But conceding the *English law* on this subject to be as contended for by the relator, *is it the law of this state* and of the United States ?

Rivers in *Englamd* are comparatively small, and in almost every case the *flowing* and *ebbing* of the tide is in fact the criterion of a *navigable* or *public river ;* but even there the sound judgment of Lord *Mansfield* rejected this criterion. In *The Mayor of Lynn* v. *Turner,* 1 *Cowp.* 86, which was a judgment against a corporation for not repairing and cleaning a creek, into which it was alleged the tide of the sea *was accustomed to flow and re-flow,* he says : "*Ex facto oritur jus.* How does it appear that this was a navigable river ? The flowing and re-flowing of the tide does not make it so ; for there are many places into which the tide flows that are not navigable rivers, and the place in question may be a creek in their own private estate." Can the English law extend to our large rivers, lakes, inland seas ? Their waters gathered would form a mighty ocean into which, were the whole *land of the common law* cast, a ripple on its surface would be scarce produced ; so all the waters and streams of Great Britain diverted into the Niagara would cause no perceptible accession. Do the islands in the Niagara, the Mississippi, the Missouri, and in our lakes and inland seas belong to the owners of the adjacent shores ? If so, the acquisitions of individuals by *construction* would in many instances far exceed what they obtained by express *grant.* We are not, however, without adjudications on this subject. In *Pennsylvania* and in *South Carolina,* the doctrine of the common law in this respect has been held to be inapplicable to this country.

In *Carson* v. *Blazer*, 2 *Binney*, 25, Yates, J. observes: NEW-YORK, Sept. 1830. Canal Commissioners v. The People. "The uniform idea has ever been that only such parts of the common law as were applicable to our *local situation* have been received in this government. The principle is self evident. The adoption of a different rule would, in the language of Sir Dudley Ryder, resemble the unskilful physician who prescribes the same remedy to every species of disease." In *Carson* v. *Blazer*, the plaintiff as the proprietor of the bank of the *Susquehannah*, claimed an exclusive right of fishing opposite his shore, and it was decided that the bed of the river remained in the commonwealth as other ungranted lands. Tilghman, C. J. in the same case says: "This common law right, if even it was properly applicable to the Susquehannah and Delaware and other large waters, was not deemed proper for this country, nor was it adopted up to the period of our revolution, because the several acts of the assembly declaring these rivers to be highways and regulating the fisheries in them are incompatible with the common law right; and since the revolution no part of the common law has been adopted, except that which was proper for our country. See also the case of *Shrunk* v. *The President of the Schuylkill Navigation Company*, 14 *Serg. & Rawle*, 71, and *Cates* v. *Wadington*, 1 *McCord's South Carolina R.* 580. Chancellor *Kent* intimates that the modification which the common law has undergone in those states cannot be very material, as he considers it still applicable to rivers *merely capable of being made navigable*, in which are obstructions to the passage of boats of every description, and that the adjoining owners in such cases would still hold *ad filum aquæ*. 3 *Comm.* 347. In this, however, he differs with Sir *Matthew Hale*, who in *de jure maris*, ch. 3, seems to acknowledge that if a stream is rendered navigable by making of locks or cuts, or drawing together other streams, and it be done at a common charge or by a public authority, it become *juris publici*.

How far have we adopted the common law of England? By the constitution, "Such parts of the common law and of the acts of the legislature of the colony of New-York, as together, did form the law of the said colony on 19th April, 1775, and the resolutions of the congress of the said colony,

and of the convention of the state of New-York in force on 20th April, 1777, which have not since expired or been repealed or altered, and such acts of the legislature as are now in force, shall be and continue *the law of the state,* subject to such alterations as the legislature shall make concerning the same." The common law of England has no authority in colonies acquired by conquest or treaty. 1 *Black. Comm.* 108, 9. 2 *Salk.* 411. 2 *P. Wms.* 75, 76. The colony of New-York was acquired by *conquest* in 1664, and although England had a claim on the ground of prior discovery, she had been dispossessed, and the colony was under the dominion of the *Dutch* from 1614 to 1664. The dominion of the English was therefore obtained by conquest, and by the articles of capitulation, the *Dutch laws and customs* were in part saved and secured to the inhabitants. The common law was introduced by the English, but it had only a modified and limited operation. The courts exercised a sovereign authority in determining what parts of it and of the statute law ought to be extended to the colony, the difference of circumstances necessarily requiring in some cases, the determination of both. *Smith's Hist. of N. Y. Carey's ed.* 262, 3. At as early a period as 1668, the government exercised the right of regulating the use of the rivers Hudson and Mohawk for the public benefit, claiming the control of the same above the tide waters, and have continued such claim, and exercised such right, and even granted islands in those rivers down to the present day. See *Report of Committee of Assembly, Journals* 1827, *p.* 954. This claim of the government and exercise of right, is conclusive evidence that the common law on this subject has not been recognized here except subject to modification so as to accommodate it to the circumstances of the country. By the *civil law,* which was the law of the *Dutch,* rivers belong to the public. 1 *Domat,* 28. *Cooper's Inst. tit.* 1, § 2, *p.* 68. *Articles of Capitulation,* 2 *R.-L. app.* Sir Matthew Hale, admits that *usage* may vary the law as to the rights of the owners of shores of rivers. Is it not the *usage* here, for the government and not the owners of the adjacent shores to control the use of rivers and the waters thereof? The acts of our legislature declar-

ing rivers public highways, are inconsistent with the rights of NEW-YORK, the owners of the adjacent shores according to the princi- Sept. 1830. ples of the English law; and so similar laws in *Pennsylvania* Canal Com- were considered by C. J. Tilghman and Mr. J. Yates. If missioners these rivers were *public highways* by the common law, what The People. was the occasion of those acts?

*A. Van Vechten,* for the relator, contended that the only question presented for consideration was whether the *middle sprout* of the Mohawk river was granted by the patent of the manor of Rensselaerwyck. He adverted to the description of the northern boundary specified in the patent, to wit, the *Cahoes* or the great falls of *the said river,* and to the description of the tracts of land granted by the patent, stated to lie on both sides of the *Hudson river,* and insisted that upon any construction of which the grant was susceptible with any plausibility whatever, *the middle sprout* of the Mohawk river would and must of necessity be included within the grant. To prove this position, he commented upon the *terms* of the grant, adverted to the notorious facts that the *Cahoes Falls* are about two miles *west* of the western bank of the Hudson river, and submitted several principles upon which the man- or of Rensselaerwyck might be located; the result of each being that the middle sprout was embraced within the grant.

As to the admission of the present proprietor of the man- or, stated in the return of the appraisers, that he never had claimed the bed of the middle sprout or considered the same as included within his patent, and that his conveyance there- of was voluntary and without consideration, the counsel remarked that these allegations were gratuitous and unverifi- ed; but, if considered, could have no influence in the decis- ion of the question before the court. A parol disclaimer could not affect the title to land of a party making such dis- claimer; much less could it affect the title of his grantee, who had acquired the estate by conveyance long before such admissions. As to the conveyance being voluntary, it laid not in the mouths of the plaintiffs in error to raise the objection.

The counsel next proceeded to discuss the facts stated in the return of the appraisers as to the grants of islands in rivers above tide water, and as to the acts of the legislature declaring such rivers public highways and regulating the use of the waters ; and to comment upon the arguments of the opposite counsel. He observed, the whole course of the reasoning of the counsel is directed to a question not arising here, to wit, whether a grant or conveyance of land, bounded by a stream of water which admits of no navigation for any purpose, extends to the middle of the stream ; for if the relator's construction of the manor patent is sound, he has a clear title to the whole of the middle sprout, and of course to the *fall* in it. Hence it follows, that whether the doctrine laid down by the supreme court in the case *Ex parte Jennings, 5 Cowen,* 518, relative to a conveyance of land bounded by the *Chitteningo* creek, that it gave the grantee a title to the bed of the river *usque filum aquœ,* is or is not sound, it cannot apply to a patent which is not bounded by one side of a stream, but comprehends the whole stream within its limits.

The patents alluded to by the plaintiff's counsel are stated to be bounded by the margin of the Hudson or Mohawk. Both those rivers have been used for the purposes of navigation with boats and rafts from the earliest settlement of the country ; in which particular they are distinguished from streams which are not and never have been susceptible of such use. Hence the acts of the government in relation to the Hudson above tide water and the Mohawk on its whole extent, have recognized them as *water highways* for boating and rafting, the passage of which could not be obstructed by bridges or mill dams without the sanction of the legislature. No such exercise of power, however, has ever been extended to *streams wholly unnavigable* for either boats or rafts. Every inland river that is not navigable appertains to the owners of the soil on each side. 3 *Cruise, tit.* 27, § 32. *Davis' Rep.* 155.

It has been urged that the common law rule that the owners of the adjacent shores of rivers above tide waters hold *usque filum aquœ,* does not extend to this country, and is not applicable here ; nay, the report of a legislative committee has

been gravely cited in support of the proposition, and it has
been contended that this court have the power so to declare
and apply the law in the case now before them.   In the first
place, the relator protests against the authority of a legisla-
tive committee to determine what is the *law*; and secondly,
it is denied that any such committee were warranted in dis-
claiming the existence of the common law in this state; for
by the 35th section of the constitution of 1777, it is declared
that such parts of the *common law of England* and of the stat-
ute law of Great Britain, and of the acts of the legislature of
the colony of New-York, as together did form the law of the
colony on the 19th April, 1775, should be and continue the
law of this state, subject to such alterations as the legislature
of the state should from time to time make concerning the
same.   This constitutional provision, which was adopted by
some of the wisest statesmen and most distinguished practi-
cal lawyers of that or any other age, establishes the follow-
ing important points in relation to this subject: 1. That parts
of the *common law* and *statute law* of England were in force
here before the revolution, and 2. That both were to contin-
ue in force until altered by the legislature; and if so, how
could any legislative committee assume to express a doubt
whether we had any common law? or how could the mem-
bers of such committee feel themselves warranted in intimat-
ing that our courts were authorized to reject any part of the
common law which was recognized by the constitution?
The power of alteration was limited to the legislature, and
until altered the courts are bound by it.

It has also been said that certain parts of the common law
are not applicable to the state of this country.   Be it so.   Is
not the common law applicable to rivers used for the purpose
of internal navigation, and suited to the state of the country?
And if so, does its application to such rivers require its ex-
tension to streams of water *which are not used and incapable of
being used* for such purposes? Surely not.   If a departue from
the common law is warrantable, it is so only, so far as to
adapt it to our situation; beyond that there is no necessity
or warrant for departing from it.   Then, let it be answered,
does the necessity extend to *streams not navigable?* Were such

streams either in England or here ever considered as placed on the footing of navigable waters? No. What follows? The latter remain subject to the operation of the common law. This conclusion is based upon the principles of public policy and strict justice, for who besides the owners of the adjacent lands can use such streams? The state can not, because they are not susceptible of a beneficial use except by the owners of the adjacent shores, unless appropriated as *feeders to canals;* a use which half a century since was not dreamt of. Whence then arises the presumption now contended for, that the control of those streams was intended to be reserved by the government in grants of an early date.

Again, it is argued that the doctrine claimed by the plaintiffs to be applied to this case is founded on the *civil law* which prevailed in the Netherlands, whence the first settlers of the colony emigrated; and that by the articles of surrender to the Duke of York the inhabitants retained all the rights secured to them by the civil law. Now be it so, for argument's sake, and then let us inquire whether by the civil law all *unnavagable streams* were reserved to the government? If so it is asked for what purpose? The learned counsel have contented themselves with general assertions without shewing the civil law doctrine in its details. The truth is that the *civil law*, like the common law, only gives the government the control of all rivers and streams which are susceptible of public use, distinct from the ownership of the banks of the rivers; but does not deprive the owners of the banks along streams of a different description of the benefits of their local situation, to convert the water power which such streams afford to hydraulic purposes within the limits of their respective grants. Were this not so the government would literally be placed in the situation of the dog in the manger, inasmuch as none but the owners of the adjacent lands can employ such water power, and if they be prohibited, its use will be wholly lost. The fact that the early *Dutch* settlers brought the *civil law* with them from the Netherlands, and that they were secured in the enjoyment thereof by the articles of capitulation cannot avail the plaintiffs in error, because the *public* property acquired by the surrender became subject to

the disposal of the *English* government, and of course upon
its own terms; nor did the fact of the manor of Rensselaer-
wyck being held originally under a *Dutch* grant disable the
proprietor thereof after the surrender of the colony to accept
enlarged and confirmatory grants from the British govern-
ment, or restrain the latter from making such grants, to be
held according to the principles of the common law. Besides,
the recognition and adoption of the common law by our con-
stitution as part of the law of the state removes every difficul-
ty which has been supposed might arise from the reservations
in the articles of surrender.

The counsel for the plaintiffs in error err in assuming that
if the common law doctrine maintained by the supreme court
in the case *Ex parte Jennings* prevails here it must unavoida-
bly extend to all our large rivers and lakes. Such is by no
means a necessary result, nor has it ever been so considered
by our government. The principle is not new that courts in
the application of general legal doctrines have the power to
modify the rule in its application according to the peculiar
circumstances of the case ; and this principle has frequently
been acted upon by the constituted authorities of the state in
relation to its large rivers and lakes. Hence it is that those
great and valuable waters have always been the subject of
legislative regulation to facilitate their public use with water
craft suited to their navigation for the convenience of inter-
nal commerce ; of such a character are the acts passed au-
thorizing grants of lands under the waters of navigable rivers
and along the margin of lakes for the purpose of erecting
docks to promote the commerce of the state. It will be ob-
served, however, that these acts contain provisions recogniz-
ing the rights of the owners of the adjacent lands to all the
advantages incident to their local situation by making the
water grants issuable to them only. No such provisions have
ever been made relative to *unnavigable streams*. Why ? The
state claimed no control over them, and they therefore have
been left to the enjoyment of the owners of the land on each
side, according to the doctrine recognized by the supreme

NEW-YORK,
Sept. 1830.

Canal Com-
missioners
v.
The People.

court in the case *Ex parte Jennings,* relative to the *Chitteningo* creek.

Nor can any argument in favor of the plaintiffs legitimately be drawn from the exercise of the power of the state in declaring certain streams public highways, in regulating ferries and in passing laws for the preservation of fish. The only ground upon which such streams could be declared *public highways,* was, that they were capable of being used and actually were used as water highways for the accommodation of the public. To declare them so by law could not make them so in fact, and it cannot therefore be intended that the legislature has been guilty of the monstrous absurdity of declaring by law a river or stream a *water highway* when in fact there is none. *Ferries* are regulated also for the public convenience and to prevent fraud and imposition; but here also the rights of the owners of the shores are recognized, they being entitled to the grants to maintain ferries. The preservation of *fish* in our waters is an object of general interest, and therefore undeniably within the scope of the general power of the government. The acts of the government in neither of these particulars impugn the doctrine of the supreme court or clash with the claims of the relator.

It has been said, and with seeming seriousness, that the act providing compensation to individuals for loss or damage sustained in the prosecution of the scheme of creating navigable communications between the lakes and the Atlantic does not apply to a case like this; that it applies only where the property of individuals is *taken* and appropriated to the public use, and that the injury complained of by the relator, proceeding from the *overflowing* of his water fall, he has no claim under the act. It is asked whether this objection is not an outrage upon common sense, and contrary to the plainest dictates of justice. What is the object of the act? To provide compensation for injuries sustained. Is the relator less injured in his property because his fall is rendered useless by drowning instead of being demolished? Can it be said truly that the fall is not *taken* for public use, when, to effect the object of raising the waters in the Hudson by means of the dam, it is overflowed? It is no longer a fall, and it has been

taken from the relator in the prosecution of the public works. NEW-YORK,
Sept. 1830.
Again, it has been gravely stated, by way of objection to the
relator's claim, that his fall was *unoccupied*. What then ? If it
was the property of the relator, and has been rendered useless
by the canal operations, he is entitled to compensation to the
amount of its value in its unimproved state. It surely was
not forfeited to the state by non-user. He might have con-
verted it into money by sale. Can it be pretended that he
was not injured by the deprivation of this right ? On this point,
however, we have the declared sense of the legislature, who,
by a special act rendered necessary by the circumstance of the
claimant being one of the canal appraisers, made provision for
the appraisement of the loss or damage sustained by an indi-
vidual whose *unoccupied* mill scite on the bank of the west
sprout of the Mohowk was destroyed in the prosecution of
the works of internal improvement, *Laws of* 1328, *p.* 80.

Canal Com-
missioners
v.
The People.

The following opinions were delivered :

By the CHANCELLOR. In England no principle of the
common law as to the rights of property is better established
than that which is the chief subject of controversy in this
case. There a grant of land bounded upon the sea shore,
or upon a stream or arm of the sea where the tide ebbs and
flows, conveys to the grantee only that part of the bank
which is not covered by the water at flood tide. And neither
the lands under the water, the islands therein, or the right
of fishery will be conveyed by implication. In order to af-
fect these the terms of the grant must be so clear and ex-
plicit as to leave no manner of doubt as to the intention of
the grantor to part with those rights which the welfare of the
public requires to be reserved for the benefit of the citizens
at large. But the rule is directly the reverse as to those
grants which are bounded on rivers and streams *above tide
water*. In such cases, if the grant is bounded on the stream,
or along the same, or on the margin thereof, or where any
other words of similar import are used, the grant legally ex-
tends to the middle or thread of the stream ; and not only
the bank but the bed of the river, and the islands therein, and
the exclusive right of fishing are conveyed to the grantee,

unless they are expressly reserved, or the terms of the grant are such as to show a clear intention to exclude them from the general operation of the rule of law ; 5 *Coke's Rep.* 106 ; *Davie's Rep.* 152 ; 3 *Kent's Comm.* 344 ; *Hale De Jure Maris ;* yet the right of the riparian owner to the stream itself was not *absolute* by the English common law. If the stream was *navigable,* although the legal ownership was assigned to the individual, it was subject nevertheless to the right of the public to use the waters thereof as a public or common highway for the passage of boats and other water craft.

Such unquestionably was the common law of England at the time of the first settlement of this country, and it has continued the same down to the present day. This is not denied on the part of the plaintiffs in error ; but it is insisted by them that such is not the law in this state ; that this principle of the common law was never introduced here, and that it is not applicable to the Hudson, Mohawk and other streams in this state which in many places are boatable above tide water. This is an important question, involving not only the claims of those whose mills and mill sites have been destroyed by the making of the Erie and Champlain canals, but also the rights of many other citizens to some of the most valuable property in the state. Many of our fresh water streams are navigable with boats and rafts, and have been declared *public highways* by the legislature, or have become so by prescription, and yet the original beds of some of these streams, and the banks of most of them are occupied by extensive milling and manufacturing establishments. The use of a part of the bed of the stream is absolutely necessary to the existence of these establishments, but it is probable that not in one case in a hundred has the public ever *expressly* granted the lands under the water. It therefore becomes our duty to examine this question with great caution ; and with reference to the important interests involved in it : for if the state has the right to take an *unoccupied,* and perhaps unimportant mill site, the title to which depends upon this principle of the common law alone, it may also have the right to take half a milllon of property from the owners without compensation, which is claimed under a similar title.

By the constitution of this state such parts of the common law of England, and of the acts of the colonial legislature, as were in force of the 19th of April, 1775, are now the law of this state, except so far as the same have been altered by subsequent legislation. It is a natural presumption, and therefore adopted as a rule of law, that on the settlement of a new territory by a colony from another country, and where the colonists continue subject to the same government, they carry with them the general laws of the mother country; which thus become the laws of the colony until they are altered by common consent or by legislative enactment. The colonists can hardly be presumed however to have adopted those laws which were merely *local* in their nature, and wholly inapplicable to their situation in the new territory. On these principles it is contended that as the state was originally settled by a colony of the *Dutch*, the rule of the *civil law* prevails as to all our streams which are navigable with boats or rafts above tide water. Or at least, that the rule of the common law on this subject was local; was wholly inapplicable to the fresh water rivers of this state, and, for that reason, was never in force in the colony.

There might be some weight in the first of these objections if the crown of Great Britain or the colonial government had ever claimed this province by right of *conquest*. But it is matter of history that it was always claimed by right of *discovery* and not as a conquered country ; and that no part of the *civil law* as such, except that which was derived from England has ever been in force in this colony. The recitals in the patent under which the relator claims title to the mill scite in question, show that the province was granted to the Duke of York as a part of the domains of the crown, several months *before the surrender* to Sir Richard Nicholl, and before any atttempt had been made to take possession thereof by force. The guaranty to the Dutch settlers of the peaceable enjoyment of their possessions did not alter the nature of the British claim to the country. It was a just and wise policy on the part of the Duke's government ; by it he retained in the colony a great number of industrious, intelligent and valuable inhabitants, of whom and their descendants, even at this day the

state has much reason to be proud. After a very short strug-
gle they submitted peaceably to the Duke's claim, and subse-
quently they obtained patents from the crown for the lands
they originally held under grants from the government of the
States General of the Netherlands. The territory being thus
claimed and established as a British colony, the common law
of England became the fundamental law of the province. Al-
though the ancient Dutch customs undoubtedly had some in-
fluence in changing the harsher features of the common law
in relation to private transactions between individuals, yet as
the executive government was generally administered by Eng-
lishmen under the direction of the crown, it must be presum-
ed that in all grants of land, and other transactions with its
subjects, the government acted upon the general principles of
the *common law*. It lies, therefore, with those who deny its
existence in this particular case to show that such was not the
law of the colony, at the time of the original grant of the manor
of Rensselaerwyck by James the second, or at the time of the
confirmation thereof in 1704.

But was there any thing in the *local situation* of the colo-
ny, or of the rivers of this state, above tide water, as they
were then known to and used by the colonists, which should
forbid the introduction of this principle of the common law,
or which necessarily required its abrogation? It is true, the
claim of the Duke of York extended to that part of the *Con-
necticut river* which afterwards formed the eastern boundary
of the counties of Cumberland and Gloucester. But that
was always a disputed boundary, and the whole state of *Ver-
mont* was then an unexplored wilderness occupied as a hun-
ting ground by the *Maquaas* and other tribes of Indians.
That part of the *Connecticut* river could not have been known
to the colonists as a navigable stream ; and even as to that
the supreme court of New-Hampshire have recently decided
this principle of the common law was applicable. *Scott* v.
*Wilson*, 3 *New-Hamp. Rep.* 321. The eastern bank of the
*Niagara* and *St. Lawrence* rivers were in the actual posses-
sion of the French, and were equally unknown to the colo-
nists. These rivers could not therefore have influenced
them in the adoption or rejection of this principle. The

principle itself does no appear to be sufficiently broad to

embrace our *large fresh water lakes, or inland seas,* which are wholly unprovided for by the common law of England. As to these there is neither flow of the tide, or thread of the stream, and our own local law appears to have assigned the shores down to the ordinary low water mark to the riparian owners, and the beds of the lakes with the islands therein to the public. What then was there in the situation of the *Hudson* and *Mohawk,* with their tributary streams, or any other fresh water rivers which were known to and used by the colonists for the first one hundred years after the capitulation of Governor Stuyvesant which could have induced them to reject this part of the common law of England? For it must be recollected it had not then been discovered that these rivers were made for the purpose of feeding canals. It was even more important here than in England at that time to assign the property of the stream to the owners of the adjacent lands, to enable them to construct dams and erect mills for the benefit of the settlers in a new country. The smallest sloops could not ascend the Hudson more than three miles above tide water; and the Mohawk was cut off by a barrier impassable by any craft whatever. It is said the Mohawk above the *Cahoes* was navigable with sloops for a considerable distance; and that in several places above *Stillwater falls* the Hudson was also boatable; but how did they differ in this respect from the Thames, the Severn, the Trent, the Ouse and other rivers in England, which were boatable and used as public highways in many places above the influence of the tide? If that was not a sufficient objection to prevent the establishment of such a law in England, why should it have operated against its introduction here? The common law made ample provision for cases of this kind, by declaring waters thus useful for the purposes of commerce *public highways.* Thus, while it assigned to the owners of the adjacent lands the legal title to the bed of the stream, they took it *subject* to the servitude, or right of the public to use the same for the purpose of navigation. It is on this principle that the people of this state, by their legitimate organ the legislature, constantly exercise the power,

which formerly belonged to the British crown, of declaring those waters which are thus navigable public highways. They also have the power to regulate the manner of building dams, and other hydraulic erections, so as to preserve this public right of navigation ; but they have not the right to destroy the property of individuals for the purpose of *making waters navigable* which are not so by nature, or of appropriating such waters to the public use by artificial erections or improvements, except upon the constitutional terms of giving to the persons injured thereby a fair remuneration for their private losses.  If therefore we had no adjudications on this subject in our own country, I think we should be bound to apply the rule of the common law to the case under consideration.

But if there was any possible doubt on this subject it is removed by the numerous American decisions referred to by Chancellor Kent, and in the reporter's note to the case of *Jennings, 3 Kent's Comm.* 346 ; *6 Cowen's Rep.* 543, *note.*  I think those cases show beyond all controversy that this principle of the common law has not only been adopted in this state, but in nearly every other state in the union, where the question has been agitated.  It is not necessary to express an opinion whether this principle can be properly applied to some parts of those streams which are navigable from the sea by large ships and vessels, far above the influence of the tides, as that question can never arise in this state.  We have no such rivers ; and as to the middle sprout of the Mohawk, it is not pretended by the plaintiffs in error that it ever was navigable in any way whatever previous to the erection of the dam in question.

It is supposed by the plaintiffs in error, and introduced by way of argument into the return to the alternative mandamus, that several acts of the legislature granting the right to erect dams in the Hudson and the Mohawk above tide waters, are inconsistent with the right claimed by the owners of land bounded on those rivers ; but on examination these acts will be found perfectly consistent with the right claimed.  I have already stated that the common law rule admits the right of the sovereign to regulate and protect the natural nav-

NEW-YORK,
Sept. 1830.

Canal Com-
missioners
v.
The People.

igation of such rivers as are public highways above tide wa-
ter. The north sprout of the Mohawk at Waterford was a
boatable stream, and the Hudson above that place, as well as
the Mohawk above the Cahoes, had long been used as pub-
lic highways. It would therefore have been an indictable
offence at the common law for owners of the bed of the river
to obstruct that navigation without the consent of the legisla-
ture. *De Jure Maris, ch. 3.* It was but a measure of prop-
er precaution on the part of the owners of these mill scites
to get the assent of the legislature to erect their dams, in the
manner proposed, to protect them against prosecutions for
impeding the navigation. The grant to *Stilson* was probably
obtained for similar reasons. From the description of the
premises in that patent, I infer that he was the owner of the
adjacent shore, and had already erected a mill there. He
had probably erected his wing dam in such a manner as to
obstruct the floating of timber down the stream on that side
of the river, and obtained the grant from the crown to pro-
tect himself against a prosecution for a nuisance. The re-
cent grant of a rock at *Glen's Falls*, where the river never
was navigable, and which I believe is included within the
acknowledged boundaries of an old patent, and the still more
recent act of the canal commissioners in leasing the new isl-
and below the Troy dam, can certainly have no influence in
determining what the common law was at the time of the
patent to Van Rensselaer, granted more than one hundred
years before that time. Notwithstanding this recent act of
the commissioners, the president of that board certainly knew
the fact that all the islands of any value between Troy and
Waterford, which had not been previously granted, were ac-
tually held and claimed under that patent.

I have already expressed my opinion that the rule of the
common law does not extend to our large lakes. Of course
no argument against the existence of the rule itself can be
drawn from the practice of the government in granting the
islands in those lakes, or from the grants of the land under
water for the erection of wharves and docks.

Vol. V.                    57

I have adverted thus freely to the existence of known facts, because the return of the appraisers shows that their opinion as to the construction of the patent to Van Rensselaer is founded on matters within their own knowledge, or matters of public notoriety, and not upon any strict legal proofs which were produced before them; and because on the argument this court also decided that it was proper for the counsel to. refer to the report of a committee of the legislature, and other facts of public notoriety, in support of the argument against the right of the relator. There is in truth no disputed fact in this case. Nearly every member of this court must be personally acquainted with the local situation of the premises described in the patent of Rensselaerwyck, so far as to enable him to give it a legal construction; and to those who are not intimately acquainted with the localities, the map annexed to the case will afford all the requisite information. The appraisers, as a matter of law, arrived at the conclusion that the middle sprout of the Mohawk was not granted to Van Rensselaer. It was so argued, and the decision in the supreme court was made upon that point; and I think there is sufficient before us to present the same question of law for our decision.

That the place in question is above tide water; that it lies between the north and south bounds of the patent to Van Rensselaer; that Tibbits has now a clear paper title to it, if it passed by the original grant, are facts not controverted by the return; and I lay out of question the parol disclaimer of Van Rensselaer which was made more than thirty years after he had parted with his title, as it cannot possibly affect the rights of his grantee. Some little obscurity is thrown upon the grant to Van Rensselaer by the peculiar manner in which it is worded. On the argument, it was supposed that the bed of the river and the islands within the same were intended to be *excluded* from the grant; and as the *Cahoes*, or great falls, is described as being on the Hudson river, it was insisted that all the lands between the west sprout of the Mohawk and the eastern shore of the Hudson were of course *excluded*. But on a more careful examination of the terms of the grant, it will be found to include the lands *in* the Hud-

son river, as well as the twenty-four miles in width on each bank thereof. The description of the lands granted commences thus : " All that and those tract and tracts of land called Rensselaerwyck, *lying and being in and upon the banks of Hudson river,*" &c. " Beginning at the south end or part of Berrein Island *on* Hudson's river aforesaid, and extending northerly up along both sides of said river," &c. Both sides of the river are referred to as forming a base from which the twenty-four miles are to be reckoned each way ; but the previous expressions show that the colony of Rensselaerwyck included the islands or lands lying and being *in* the river as well as the lands on the banks thereof on each side. When it is recollected that this is a confirmation of a previous grant which had been made to the family of Van Rensselaer as the head of a colony, and for the benefit of the settlers under that grant, there seems to be no good reason for excluding the islands within the limits of the colony from the operation of the grant. The subsequent words also show that the rights intended to be granted were much more extensive than those usually granted by the crown to individuals : waifs, estrays and royalties are expressly granted ; " together with all and every the isles, *islands,* rivers, creeks, runs of water, mines minerals, (royal excepted,) fishings, fowlings, huntings, hawkings and all other royalties, powers, franchises, harbors, profits, commodities and hereditaments to the said premises or any part thereof belonging or appertaining." The lands lying under the waters of the river are not granted as such, in *express terms,* and therefore by the rules of the common law that part which was actually covered by the *tide waters* did not pass by this grant ; but I am satified all the islands, and the bed of the rever *above tide water,* are actually covered by the patent to Van Rensselaer. This being the case, the legal title to the middle sprout of the Mohawk, which is a mile or two below the north bounds of the patent, if it had not been previously conveyed, passed to Van Schoonhoven by the deed of 1792, and is now vested in Tibbits the relator in the court below.

Whether the water-fall in that sprout was of any great value to him before the erection of the Troy dam, and whether

the damages which he has sustained are greater than the benefits he has received by the construction of the canal, are questions for the appraisers to decide, and with which we have no concern. That question they refused to examine, because from the legal construction which they put upon the patent, the title to the land was still in the state. The supreme court decided they were wrong on this question of law; and directed them to proceed and ascertain what damage, if any, had been sustained by the present owner of the premises.

It was objected on the argument that the premises in question had not been taken for the use of the canal within the meaning of the act; but certainly the permanent overflowing of the property of an individual to the depth of nine feet, for the purposes of the canal, is as effectual an appropriation of the property for that purpose, and for the use of the canal, as it could be if the canal boats actually floated over its surface.

The appraisers having refused to decide the question as to the amount of damages, if any, which had been sustained, a mandamus was the proper remedy. I think therefore the decision of the court below was correct, and that it should be affirmed.

By Mr. Senator ALLEN. The question to be decided according to my view of the subject is, whether the premises claimed by Tibbits are within the boundaries of the patent to Van Rensselaer, and what are his rights and what his title to the middle sprout of the Mohawk river. The patent bears date the 20th of May, 1704, and was issued, therefore, long anterior to the separation of this country from Great Britain. The common law and legislative acts as they existed in April, 1774, are the law of this state except in such particulars in which they have since been altered. All grants of land within this state made by the king of Great Britain, or officers acting under his authority, previous to October, 1775, are declared valid by the constitution. Now, although the common law as it existed in 1774 may be altered or repealed by the legislature to take effect from and after such alteration or repeal, it cannot be so altered as to affect grants existing prior to 1774.

NEW-YORK,
Sept. 1830.

Canal Com-
missioners
v.
The People.

Ancient grants must be expounded according to what the law was at the time of making them.  4 *Comyn's Dig.* 419.

By the common law, fresh water rivers, in which the tide does not ebb and flow, belong to the owner of the adjacent soil, and if a person holds land on the one side of such river he owns the river to the centre, and if on both sides he owns the whole river in front of his property.

In construing the patent of Van Rensselaer therefore, it is but fair that it should be done with reference to the law as it existed when the grant was made, or at least as it stood in 1775.  The patent commences at the south end of *Berrien Island* on the Hudson river, and extending northerly up along both sides of said river unto the Cahoes or great falls of said river, and extending itself east and west all along from each side of said river backward into the woods twenty-four English miles, with all the rights and appurtenances of said tract and tracts of land, &c. together with all and every of the isles, islands, rivers, creeks, *runs of water*, &c. and *heredita-ments*, whatever to the said premises or any part thereof belonging or appertaining.  A grant shall be extended to every thing comprised within the words, though they are not regularly described in the deed.  4 *Comyn's Dig.* 419. No words in the English language can express more fully the absolute conveyance of all the rights, property and hereditaments within the bounds of this grant not previously conveyed.  *Hereditaments* is a very comprehensive word whereby every thing passes which may be inherited, corporeal or incorporeal, real, personal and mixed.  4 *Comyn's Dig.* 413.

The grant begins at the south end of *Berrien Island*, and extends north both sides of the Hudson, unto the Cahoes falls of the said river.  The misdescription can only be accounted for upon the supposition that the geography of the country was unknown by the grantor and grantee when the original grant was issued.  When the words of an ancient deed are equivocal, the usage of the parties under the deed is admissible to explain them. *Livingston* v. *Tenbroeck*, 16 *Johns. R.* 14.  The ancient location therefore, together with the undisturbed possession of the premises ought to be the guide in cases like

the present. By the map of the state, compiled by the present surveyor general, it would seem that the location evidently included this stream of water. The northerly line of the manor intersects the Cahoes, and strikes the east side of the Hudson some distance north of the middle sprout of the Mohawk, and therefore includes that sprout within the bounds of the manor. If the patent is to extend as by the description in the grant, from Berrien Island on both sides of the Hudson, until the limits north strike an east and west line drawn from the falls to the Hudson, which I believe was the line by which the manor was originally located, then the middle sprout falls within the patent, as the extension to the west must cover it. If on the other hand we extend the line from Berrein Island up both sides of the Hudson until it strikes the southerly end of Green Island, and then up both sides of the south branch of the Mohawk river, and so up that river to the falls, and thus roll out 24 miles east and west, the extension to the east must cross the Hudson and cover the middle sprout. The middle sprout therefore must be considered as within the patent, and comprehended under some of the words *rivers, creeks, or runs of water;* and if within the patent, then the title was in Van Ransselaer or in those to whom he conveyed. The descriptive part of this grant, according to my view, is sufficiently full to have justified a claim even to the land under the waters of the Hudson ; and the fact that the grantee has never preferred such claim does not prove that the grant did not originally cover it. That the common law, as it existed when the patent was granted, gives the grantee the sole right of the streams within its bounds in which the tide does not ebb or flow, I think must be admitted ; and as the stream called the middle sprout is clearly within the patent, was not navigable before the building of the dam, and the tide has never ebbed or flowed in it or over the land under its water, it is equally clear that the title was in Van Rensselaer, and that those who hold under him are legally vested with the fee of the property. Above the flow of the tide the river becomes private, either absolutely so, or subject to the public right of way, according as it is a small or large stream. *Ex parte Jennings,* 6 *Cowen,* 518.

Two of the canal appraisers, Messrs. Young and Wood, in their return to the mandamus, have attempted to show (not under oath however) that Tibbits had no title to the stream, and state a conversation with Van Ransselaer, in which he is represented as having said that he he did not consider the stream as included within his patent; but if this was so, how comes it that Mr. Van Rensselaer has omitted to state this fact in his separate return as one of the canal commissioners? Instead of that, he broadly admits that he conveyed the property in question to Van Schoonhoven, and that he is informed and believes that the relator founds his claim to the premises, for which he demands compensation from the state, under such conveyance. One of the appraisers also avers that two of his colleagues, forming a majority of the board, determined that the claimant's title was not sufficient to entitle him to damage; but that he differed with the board, and believes now, as he did then, that the relator has a legal and equitable claim to damages, and that he is ready and willing to make an estimate and appraisement of such damages. But, say the plaintiffs in error, even supposing the title of the relator to be good, still he has no property or right which has been so affected as to entitle him to the compensation he claims. The relator, however, declared under oath that the water fall and land under the same is of great value; that the water power at said falls, which existed until the dam was constructed and was destroyed by the rise and flow of the waters in the Hudson river occasioned entirely by the dam, was of great value to him.

Again, it is contended by the plaintiffs that the appraisers were not authorized to allow for damages unless property was *taken*, and in this case they say nothing was taken from the defendant in error. Upon this principle, a man's property may be utterly ruined, as in the present case, and because nothing is *taken*, no redress for the damage sustained can be had. Suppose the dam in the Hudson had flooded the whole of Green Island instead of barely ruining the water fall of the defendant, will it be tolerated, because nothing was taken from the owner, that he must not be remunerated for the injury sustained? It cannot be. Individual property cannot be tak-

en, *or, which is the same thing, individual rights impaired,* for the benefit of the public, without just compensation. *Ex parte Jennings,* 6 *Cowen,* 518.

It was contended also that the act of the legislature did not authorize the payment of damages, such as the defendant claims. The act authorizes the taking and using any lands, waters or streams necessary for the canals, and the appraisers are to make a just and equitable estimate of the loss and damage, over and above the benefit to the owner or parties interested in the premises. It appears to me that a liberal construction of the act would have authorized the appraisers to estimate and allow for the damage done to the defendant in error. If, however, there was any doubt of the law, there was no excuse for refusing to comply with the order of the supreme court, which was *peremptory.*

That the legislature of 1828 held the opinion that damage, such as the defendant has experienced, ought to be paid by the public, is evident from the act passed for the relief of *Joseph D. Selden,* in a similar case. Selden had, in 1822, purchased a lot of land on the Mohawk river for hydraulic purposes, but the construction of the Champlain canal deprived him of all his water privileges, and the object of his purchase was entirely defeated. Being one of the acting canal appraisers, he could not of course decide in his own case, and he accordingly applied to the legislature for relief. The result was, that an act was passed on the 18th of March, 1828, authorizing special appraisers to be appointed by the supreme court to assess the damage, and directing the comptroller to pay the amount to be assessed out of the treasury. I am unable to perceive any difference between the case of Selden and that of the present defendant. They both purchased the water privileges for hydraulic purposes, and considered them valuable for the uses intended. The rights of each are invaded for the same object, namely, the construction of a public work from which the state is deriving a revenue. They both derived title from Van Rensselaer, (or those from whom they purchased did,) and why one should be remunerated for the damage sustained, and the other not, it is hard to say.

Having shown to my own satisfaction at least, that the original title to the waters of the middle sprout was in the owners of the Van Rensselaer patent; the deed from the present patentee to Van Schoonhoven, and from him to Tibbits, necessarily places the fee of the sprout in the defendant in error; and being of the opinion that serious injury has been done his property by the overflowing of the premises, I think the supreme court were right in issuing a peremptory mandamus, and accordingly am of opinion that their decision ought to be affirmed.

By Mr. Senator BEARDSLEY. The relator not having plead or demurred to the facts set up by the plaintiffs in error, but having submitted the case upon his own affidavit and the allegations of the opposite party, must be considered as admitting the facts stated by the plaintiffs. The case as presented may be assimilated to a hearing on a bill in chancery and answer thereto, and so far as facts are concerned the allegations of the plaintiffs in error must be taken as true. Had the relator wished to controvert the facts, he should have had an issue awarded to try them.

That the return is to be taken as true, and that the cause must be decided upon the facts set up by the canal appraisers and commissioners, results from another consideration. The relator complains that the plaintiffs in error by erecting a dam for the use of the state, have raised the water in the middle sprout of the Mohawk, and thereby destroyed his water fall. The canal commissioners, by raising the water, have in a measure appropriated it to the use of the state, or have taken possession for the use of the state so far as it is susceptible of possession. The case is therefore like an action of ejectment, in which the person seeking to recover must, as against a stranger or one who holds adversely, recover upon the strength of his own title, and not on the weakness of the title of his adversary. Besides, it is a general rule in regard to a return to a mandamus, that it must be taken as true unless controverted. The relator not being in actual possession, (which would have been *prima facie* evidence of ti-

NEW-YORK, Sept. 1830.

Canal Commissioners v. The People.

tle) produced his paper title which was deemed insufficient by the canal commissioners, who denied his right, and asserted a title in the state.

The relator alleges that the middle sprout is included in the patent or manor of Rensselaerwyck, and unless he sustains his allegation there is an end of the question, because the only title set up is under that patent. It is,alleged by the commissioners that General Van Rensselaer, the present owner of the patent, never claimed the *locus in quo;* and they state the circumstances under which a deed was obtained from him. This, although a circumstance against the claim, is not conclusive, because, if included within the patent, the relator acquired an interest which canot now be defeated by the disclaimer of the patentee; and if he has acquired an interest, it is probably such an one as would entitle him to damages under the laws of the state, unless, by neglecting to take possession, he has lost his right to assert a claim against the state as *prior occupants,* a question which it will not be necessary now to decide.

The boundaries of the patent are as follows: " All that and those tract and tracts of land called Rensselaerwyck lying and being in and upon the banks of Hudson's river in the county of Albany, and theretofore called the colony of Rensselaerwyck, beginning at the south end of Berrein Island on Hudson's river aforesaid, and extending northward up along both sides of the said river unto a place theretofore and yet called the Cahoes or the great falls of the said river, and extending itself east and west all along from each side of the said river backwards into the woods twenty-four English miles."

It was admitted on the argument that the grant did not include the bed of the river, and the expression " in and upon the banks of the Hudson river" means nothing more than in the vicinity or upon the Hudson river. But the subsequent terms of description " extending northward up along both sides of said river," render it not only probable but quite certain that the bed of the river was not intended to be included. Now as the case comes before us we are left entirely in the dark as to the actual location of the patent. It is a rolling patent, and is to run up the banks of the Hudson river to the Cahoes

falls in said river, and to roll back east and west from the river 24 English miles.

Probably when the first grant of the manor was made, (which was at an early day, for the confirmation took place about 120 years since,) the south or west branch of the Mo- hawk was supposed to be the Hudson, or part of the Hudson river. It runs parallel with the Hudson, and the country being then a wilderness, this branch of the Mohawk might easily have been mistaken for part of the Hudson. At all events, the Cahoes falls is a well defined and permanent object, and although said to be on the Hudson river, in absence of all proof of actual location, may, I think, be adopted as a start- ing point. And if the patent was now to be located I am of opinion that under the decisions of our courts, the falls being a permanent object, might be adopted as the boundary from whence to run west, without doing violence to the sense of the grant. If this be so, the islands and tongue of land be- tween the Mohawk and the Hudson would be excluded from the patent, and so also the water fall claimed by the relator; and having failed to show the location of the patent and an actual possession of the water fall, it would seem to follow that he had failed to establish his right to damages.

This being a question between an individual on one side and the state on the other, and involving the construction of a grant, every intendment is to be made in favor of the state. *Comyn's Dig. tit. Grant, G.* 7, 12. The dam in the Hud- son river which causes the injury complained of is erected where the tide ebbs and flows, and is therefore in a naviga- ble river, an arm of the sea, according to common law ac- ceptation, and belongs to the state; and being erected for public improvement, every reasonable construction is to be made in favor of the public against private rights. *Comyn's Dig. 3 M.* 37.

This view of the case, if correct, shows that the judgment below ought to be reversed.

Here perhaps I might stop without examining the points so ably discussed by counsel on the argument in relation to the rights of parties to rivers or land covered by water under the common law doctrine of *usque filum aquœ.* It has appeared

to me that in the present case that question could not properly arise ; but as the supreme court seem to have founded the order for a peremptory mandamus upon the doctrine in the case *Ex parte Jennings*, 6 *Cowen*, 518, and as this doctrine has been discussed with great ability, and has been relied upon by counsel as having an important bearing in the present controversy, it may, perhaps, be proper not to overlook that part of the argument.

As a general remark, it will be found correct, that the colonial government, as well as the present government of this state, in granting lands on navigable fresh water rivers, and in many instances those not navigable, have studiously avoided granting *the river itself or the bed of the river*, probably anticipating that they might be wanted for public purposes.

The supreme court have adopted the common law doctrine in regard to rivers. *Harg. Law Tracts, p.* 6. *Ex parte Jennings*, 6 *Cowen*, 518, *n.* They consider the term "navigable" as technical when applied to rivers, and that fresh water rivers above the flow of tide are not navigable within the meaning of the common law. Hence they assert and carry out the principle, that when lands are owned by the same individual on each side of a fresh water river, he owns the bed of the river, and if bounded on one side of the river he owns to the centre. This is undoubtedly the common law doctrine in regard to individuals as between each other ; but I very much question its correctness when applied to the rights of *the state*. Almost the whole current of legislation *in this state in regard to* navigable rivers is adverse to this principle. The state has granted islands in the Hudson above tide water, which, by this construction, would have passed by implication to the owners of the adjacent lands which had been previously granted. *Palmer* v. *Mulligan*, 3 *Caines*, 312, *Spencer's opinion.* They have also granted islands in the Seneca and Oswego and Niagara rivers, which by the common law doctrine would also have passed to the owners of the lands lying on the opposite shores. So also the legislature have recently granted privileges to use the waters of the *Mohawk* to individuals, and have exercised

acts of ownership and sovereignty inconsistent with the common law doctrine. *Grant to McIntyre and others, Statutes,* 1817, *p.* 296. These repeated acts of legislation are referred to by the canal commissioners, and are also collected in the report of the committee of the assembly in 1827. *Assembly Journal,* 1827, *p. 954.*

It may be doubted whether the common law rule in regard to navigable fresh water rivers ever was adopted in this state. *Smith,* in his History of New-York, says part of the common law was adopted and part rejected, and that the colonial courts exercised a sovereign authority in determining what part of the common law was to be adopted. *Smith's History of New-York,* 371, 2. This state was originally settled by the *Dutch,* who brought with them from Holland the *civil law,* and by this law the bed of rivers where grants are bounded on the margin of the stream belongs to the public, and the grantee goes to the water's edge, and not to the centre of the river; and this is applicable to all rivers, as well fresh as salt. Such also is the law of France, the code Napoleon having applied the civil law doctrine to all streams that are *floatable,* as that code expresses it. This state was not settled by the English, but was conquered by them; and it is a well established rule of the common law, that when an uninhabited country or island is discovered and settled by Englishmen, they carry with them the common law; but where a country is conquered by the English, the laws of the conquered country remain in force, unless the laws of England are substituted by express enactment. 1 *Black. Comm.* 189. 2 *Salk.* 411. 2 *P. Wms.* 75, 76. This state, as an independent state, adopted "such parts of the common law of England and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New-York, as together did form the law of said colony on the 19th of April, 1775." *Art. 35 of old Constitution, and 13th sect. of 7th art. of new C.* To apply the common law to navigable fresh water rivers in this state, it must be shewn that the British parliament or the legislature of the colony of New-York adopted it. This, it is believed, cannot be shewn; and if it could, it would be necessary in the present case to

shew that it had been adopted at the time of the confirmation of the grant, otherwise the patentee would take under the law as it *then existed.*  4 *Comyn's Dig.* 419.

The Mohawk and Hudson have always been used for navigation, and I cannot, in direct opposition to legislative grants and constructions, apply the common law principle to these rivers, where the application of the rule is against the rights and interests of the state.  If it was a question of fishery, or a contest between individuals, it might be a different question in principle, but it is not necessary to discuss that point at present.

In regard to salt water rivers where the tide ebbs and flows, the common law considers. them arms of the sea and navigable, in which the public have an absolute interest or right of navigation and fishery.  They are considered as belonging to the sovereign, who holds them for the benefit of all his subjects.  To these rivers or arms of the sea the *common law* and the *civil law* apply the same rule.  The owner of adjacent lands goes to the water's edge.  The rivers in England above tide, in point of fact, are not navigable except for small craft; reasons therefore exist in that island for the common law rule which have no existence in this country. It is contrary to fact to assert that our immense fresh water rivers are not navigable; and it is matter of just exultation, as well as benefit to the country, that in the United States we have rivers which above tide are navigable to a greater extent than would be the circumnavigation of the United Kingdoms of Great Britain and Ireland.  It is therefore preposterous to contend that the limited doctrines of the common law are applicable to the Mississippi, Ohio, Susquehannah, Niagara and St. Lawrence.  If applicable, the owners of land on these streams have a right to go to the centre of the rivers, and Grand Island in the Niagara, with 18,000 acres, would belong to the owners of the shore.

In Massachusetts and several other states, in controversies between individuals the common law has been applied to their rivers.  These states were settled by the English, who brought the common law with them; and they may have felt constrained to make an application of its maxims to this country.

But even there, had the question been between the state and an individual the decision might have been different.

Rules of law should be adapted not only to the moral but to the physical condition of the country. Had the common law originated on this continent we should never have heard of the doctrine that fresh water rivers are not navigable above the flow of the tide; nor would our courts of justice have been called upon to compromit the interests of the community by sacrificing truth to technicality and substance to form.

Pennsylvania and South Carolina have rejected the rule of the common law as regards navigable fresh water rivers, and the reasoning of the judges appears to be sound and liberal, and applicable to the situation and interests of this country. 2 *Binney,* 25. *Carson* v. *Blazer,* 14 *Serg. & Rawle,* 71. 1 *McCord's Rep.* 580.

In controversies between individuals our supreme court has frequently recognized the rule of the common law as applicable to our rivers, *Palmer* v. *Mulligan,* 3 *Caines,* 312; *Platt* v. *Troup,* 15 *Johns. R,* 216; *Hooker* v. *Cummings,* 20 *Johns. R.* 90; but these cases may be distinguished in principle from the present where the state is a party; *Jennings' case* is the first in which the court has recognized the applicability of the doctrine to the state. 6 *Cowen,* 518. On an examination of the English authorities it will be found that they are almost exclusively in controversies between individuals, in which the rights of the government did not come in question.

The result of my reflections is, that where patents have been bounded on navigable fresh water rivers in this state, and nothing appears from the grant that the state intended to part with the bed of the river, the patentee shall not by an implied grant take the river to the exclusion of the state. For this reason as well as that the relator has not shown an actual possession, or that the middle sprout was within the bounds of the manor as located, I am for reversing the order of the supreme court.

By Mr. Senator BENTON. The proceeding by mandamus is undoubtedly a proper remedy, if the relator has right, and the title is undisputed or admitted. But this court has no evidence of the title of the relator save his own statements,

and those unsupported by documentary or other testimony. This however, if admitted by the parties against whom the proceedings are instituted, would probably be deemed sufficient to sustain the relator, and warrant an order or rule for a mandamus; but if the facts are denied, I take it the party is bound to make out his title, establish his right, or prove the truth of his allegations, as well in this as any other proceeding at law.   It is a little strange that the testimony submitted to the appraisers was not in some shape brought before the court below, and if brought there it is more strange that it has not been incorporated in the case and submitted to the consideration of this court.   This court are now called upon by the parties to pronounce judgment upon a matter of right and a question of title in a most summary, and to me, in a most unsatisfactory manner.

Although no formal issue by pleading has been presented by the parties to this proceeding, I understand the plaintiffs in error to have denied so much of the relator's statements, as to preclude his recovery or to oust him of his right to a peremptory mandamus unless he make out his case by proof other than his own oath.   The relator in his affidavit states that the appraisers, after receiving testimony, have refused to assess or allow any damages to him on account of the injury alleged to have been sustained by him, assigning as the sole reason for such refusal, that he had no legal claim to the land under the water of the middle sprout; and the appraisers in their return state, that having required the production of the relator's title and carefully examined the patent with *their knowledge of localities,* they were clearly of opinion that the middle sprout of the Mohawk *is not embraced within the* boundaries of the patent, and that the relator had entirely failed to make out any title to the middle sprout.

Did the appraisers pronounce their decision upon the facts now before this court? Clearly not; they expressly negative such an inference, because they speak of their knowledge of localities.   Have this court the knowledge of the facts here alluded to? I think not.   Then if the appraisers had the constitutional and legal right to adjudicate upon the title, and if this be a legal and constutional mode of trying such

questions, a proposition which I shall by and by discuss and examine, have they determined the law of this case upon the facts set forth in the affidavit and return?

It was admitted upon the argument, and to this admission we may advert, to see whether there are not some facts which are not in the case before us, that the patent of Rensselaer-wyck begins at the south end or part of Berrein Island below the city of Albany, and that one of the islands on which the sprout is bounded is not within or claimed under the patent, (whether *Green* or *Van Schaick's* island is not known to me.) The patent locates the whole tracts as lying and be-ing in and upon the banks of the Hudson river, and extend-ing from the point above mentioned northward up along both sides of the said river, unto the place theretofore and yet called the Cahoes or the great falls of the said river, and ex-tending east and west, all along from each side of the said river, backwards into the woods, twenty-four English miles. Now, without doubt, if a fact clearly notorious can be relied upon, this patent commences below the head of tide water on the Hudson; but how far below, and at what point on the Hudson the tide ceases to ebb and flow, and on the Mo-hawk if the tide ebbs and flows there at all, is not so clear and undoubted to my mind. I apprehend the title of the re-lator, if the common law rule of construction as set up be ad-mitted, must depend upon the construction to be given to the patent under which he claims; and I cannot perceive how this court can give a just and legal construction to it without a better knowledge of localities relating to it than what is pre-sented by the testimony in the case.

Did the patentee by his grant expressly and not construc-tively take to the middle of the Hudson river at the south end of Berrien Island? If he did not, then by no rule of construc-tion known to the civil or common law could he take *ad fi-lum aquæ*, because at this point the Hudson is a navigable stream in the common law acceptation of the term, and here the tide ebbs and flows. He then is bounded in and upon the banks of the river at high and low water mark, and keeps upon those boundaries northward; but where are the *ter-*

*mini* above or below the middle sprout? Where do the banks of the majestic Hudson cease to be the *real* and known, and not the *ideal* boundary? and where, at what point in traversing this river northwardly, may the grantee of this patent by construction claim to the centre of the river?

From the map which has been furnished to the court and which makes a part of the case, there appears to be laid down upon the same *Fish Island* and *Jan Gowsend Island*, besides those before mentioned, together with several smaller ones not designated by name, lying in the Hudson river opposite Green and Van Schaick's Islands; and if we were informed by testimony who claimed these islands and under what title they are held, we should be materially aided. It must also be recollected that this patent is what is sometimes termed *rolling*; it extends twenty four English miles from the banks of the river east and west; and what location has the patentee taken? how has *he* located it? If he has started from the *Cahoes* or great falls on the west bank of the Mohawk river, and run thence west the given distance for his quantity on the west side of the Hudson, or rather in fact the Mohawk, and then started from a corresponding point on the east bank of the Hudson river and run his distance eastward, both of which points are north of Van Schaick's Island, can he, by virtue of his grant on the west side of the Mohawk, claim any farther than the middle of the stream laid down as the south branch of the Mohawk, or any farther than the middle of the Hudson by virtue of his grant on the east side of this river; and this too when we know, if admission can *inform us*, that he never claimed one of the islands bounding the premises claimed by the relator, and which are supposed to be south of the head of tide water and the north bounds of the patent? This rule of construction is not warranted by the common law. But pursuing the same course of reasoning, and admitting for the present the ground of construction assumed by the relator to be correct, I do not find, by any fact stated or admitted, that he owns a foot of the soil either on Green or Van Schaick's Island, or ever has owned any part of either contiguous to the premises. He sets up a claim to land under water, between these two pieces of

NEW-YORK,
Sept. 1830.

Canal Com-
missioners
v.
The People.

land, called the middle sprout. If the patent of Rensselaer-wyck is set up to cover some part of the premises and one of the islands contiguous, then it becomes material to inquire when and to whom this island has been granted by the patentee or his heirs; for if the legal title to this other island is in some stranger to this proceeding under a deed of anterior date to the relator's, it would be strange if in due time another claimant for damages should not appear. Sir Matthew Hale lays down the rule, that above tide water, " fresh rivers, of what kind soever, do of common right belong to the owners of the soil adjacent *usque filum aquœ ;* and the supreme court, in the case of *Jennings,* say the rule to be collected from the books is, " that the owner of the land on the margin owns to the bed over which the river passes ; and though it be nominally and in terms bounded on the margin, it extends by construction of law to the centre of the stream." Upon this latter position as to the facts, understanding them in the light above stated, it is difficult for me to perceive how the appraisers could have come to a different conclusion in respect to the relator's title, even when the above rules are applied.

Having thus far endeavored to shew, from admissions and deductions from facts stated, that we are called upon to decide a very important case in point of principle, upon evidence which, if it does not clearly shew the relator has no *title,* fails of shewing satisfactorily that he *has a right,* I will proceed to examine a point in the case which I deem it my duty to present to the consideration of the court.

The second section of the seventh article of the constitution of the state is as follows : " The trial by jury, in all cases in which it has been heretofore used shall remain inviolate forever ; and no new court shall be instituted, but such as shall proceed according to the course of the common law, except such courts of equity as the legislature is herein authorized to establish." This section presents a difficulty which, in my judgment, cannot easily be surmounted. The language cannot well be misconceived. The trial by jury, as heretofore used, shall remain inviolate forever, and no new court shall be instituted but such as shall proceed according to the

course of the common law. Two questions arise under this provision applicable to the case now under consideration ; and if I do not mistake exceedingly, present an insurmountable barrier to the affirmance of the judgment of the court below, aside from the other objections.

The individuals entitled to the damages to be estimated and appraised, are the "owners and proprietors or parties interested in the premises," and none other. In ordinary cases it may be presumed there would be no difficulty or dispute concerning the title or the right of the party whose property may have been taken for the public use, but that cases should occur in which there might be doubt on this point, is in the nature of things very probable ; and this circumstance rendered it highly proper that the appraisers should be well satisfied that the party who preferred a claim for damages should have a subsisting legal title to the subject matter appropriated, destroyed or damaged. It is their duty as public officers to make this inquiry ; and if not fully satisfied upon this point, ought they to proceed and make an assessment ? I apprehend not, because no one appears who is authorized to receive the compensation, and whose title by the payment of the money assessed would be transferred to the state. If the act of 1825, *sess.* 48, *ch.* 275, is deemed to constitute the board of appraisers a tribunal authorized to hear, try and determine a question of title to lands or real estate in a summary way without the intervention of a jury, and not according to the course of the common law, with the greatest respect for the authority that gave this act a being, and for the judicial tribunal which may have sanctioned such a construction, if any such has been given to it, I must in this place give it as my deliberate opinion, that in this respect the act is unconstitutional and void.

But such ought not and cannot be the fair construction of this act. The legislature never intended to create a tribunal to pass upon the rights of the citizen in the mode prescribed, and it cannot have been intended that the rights of the state upon doubtful questions should be thus summarily determined and compromitted ; such an assumption cannot be taken

without strong and conclusive evidence of the fact. Does <span>NEW-YORK, Sept. 1830.</span>
the act in question afford this evidence? I think not.

The proceeding by mandamus to call on the appraisers to
show cause is no doubt correct and proper; and if upon the
return the question of title is not denied but admitted, I see
no objection to the court's proceeding to examine into the
sufficiency of the return relating to the acts of the appraisers,
or any other matter which does not involve a question of ti-
tle; and when this question arises, or any fact is denied by
the return, in the latter case the relator must resort to his
proofs upon an issue, and in the former, as he can have no
claim of right by presumption, he must pursue his remedy
according to the course of the common law and by the in-
tervention of a jury. The board of appraisal are not a judi-
cial tribunal; they are not constituted to discharge any one
judicial function in the proper acceptation of the term. The
appraisers cannot sit or make any valid estimate and assess-
ment without having one of the canal commissioners, as an
agent of the state, to advise and act with them.

The judicial history of this state leaves no doubt as to the
cases in which the trial by jury has heretofore been used; and
it appears to me it cannot be dispensed with in the ordinary
proceedings of the common law courts without jeopardizing
and endangering our institutions. The naked right and title
to real estate between individuals was never adjudicated upon
in our courts of law except upon the finding of a jury; and I
hold it inexpedient and improper to do so in any case where
the state is interested, or a party, and where the matter, as
in these cases, is one involving title only. The necessity for
an inquiry into the title is more apparent from the fact that
the *fee simple* of all premises appropriated, and in relation to
which an estimate and appraisement shall have been made
and recorded, is declared to be vested in the people.

The legislature have authorized a writ of error from any
decision of the supreme court touching cases of this kind,
whether the decision be made upon any case arising upon
*mandamus* or otherwise; and although no pleadings were had
or issue joined in the cause. *Laws of 1827, ch. 219, § 42,*

<span>Canal Com-
missioners
v.
The People.</span>

*and* 1 *R. S.* 235, § 97. *This provision, however, does not* avoid the objection which arises in this cases from the state of facts presented by the appraisers' return and the other part of the case; it confers a right which did not previously exist, otherwise there was no necessity of legislative enactment upon the subject. The parties are left to the usual legal mode of establishing and controverting the matters in dispute without any statutory provision to direct and control them. Upon this latter view of the case, it might be proper to dismiss the writ of error and send the parties back to the court below to correct and amend their proceedings, and permit them to come again before this court with a special verdict on the pleadings and issue upon the mandamus; and if the decision of the cause in this court should turn upon the point here raised and discussed, it would seem but equitable, as the point was not raised and discussed upon the argument. It being a question, however, of grave and solemn import in my judgment, I have deemed it my duty to present it to the consideration of this court.

But being clearly of opinion that the relator has shown no legal title by competent proof to the premises, in regard to which he alleges he has been injured and claims damages, I think the judgment of the supreme court should be reversed, with costs, to be paid by the relator; holding that it was his duty to look into the appraisers' return, and if he found the facts upon which he must rely for a recovery, or his title, denied, he was bound to shew in himself a subsisting right. The force of the negation contained in this return cannot, I apprehend, be weakened or destroyed, because the appraisers have gone into a legal argument repudiating the principles of the common law of England concerning rivers as applicable to this state. It is evident that these officers reposed themselves in refusing to make an estimate and assessment upon the facts of the case, as well as the law applicable to the facts; but the facts, as I have before attempted to show, we have not before us.

Under this view of the case, I do not feel that it is necessary for me to examine and pronounce an opinion upon the important question raised and argued, whether the law of

England concerning rivers is or is not the law of this state ; argued with much ability and apparent confidence by the counsel for both parties. The decision of this question by this court is no doubt a matter much to be desired, but I do not feel warranted to presume a state of facts for the purpose of applying a rule of law.

By Mr. Senator TALLMADGE. The facts in this case are very imperfectly presented. This perhaps results from the mode of raising the question. They are, in the first place, set forth in the *ex parte* affidavit of the relator, on which the *mandamus* was granted. He, of course, states nothing more than he deems necessary to make out the case on his part. The canal appraisers, in their return, present such facts on their side as they consider material to the defence, and in answer to those charged in the affidavit ; and that too, in a somewhat diffuse and argumentative manner. In this way, it is hardly to be presumed that the court can be possessed of facts sufficient to enable them to come to a satisfactory decision on the merits, on a question of so much importance— a question, if we may judge from the very elaborate arguments submitted to us, involving not only the location of the patent of the manor of Renselaerwyck, but the all-important doctrine of the common law, in its extended application to the rivers and inland waters of this state. These are questions of great magnitude, upon the examination or decision of which, were the case fully presented, any court might well enter with great caution and circumspection ; but which, I apprehend, this court will be altogether disinclined to entertain or determine, upon the very imperfect state of facts before us.

By affirming the order of the supreme court granting a peremptory mandamus, we undertake to locate this patent ; and that too without a particle of evidence as to what has been its practical location. We must do it merely from the descriptive words in the patent ; and if we determine that it comprehends the middle sprout, we at the same time adopt the conclusion that it covers Van Schaick's Island also, which it is conceded was granted long before. If, too, in the lan-

guage of the patent, it extends itself from the Cahoes east
and west along from each side of said river backwards into
the woods twenty four English miles, it will include a part of
the county of Saratoga, which no one pretends was ever in-
cluded in it.    Without intending to express an opinion as to
its location, I have merely alluded to these facts to shew that
from a want of evidence before us it is improper, if not im-
possible, to undertake to decide that question.

There appears to be one view of the subject, which must
be sufficient to decide it, without going into those more im-
portant considerations.   As a preliminary to establishing a
claim to damages, the relator is bound to make out a title to
the middle sprout of the Mohawk, on which the water fall is
situate, which is said to have been destroyed or rendered use-
less.   How is this done ?   He sets forth his title, such as it
is, in his affidavit upon which the motion for an alternative
mandamus was founded.   This title consists of a deed from
Stephen Van Rensselaer to Jacobus Van Schoonhoven, dat-
ed May 5th, 1792, conveying the land under water of the
middle sprout, &c. and of other mesne conveyances down to
the relator.   These conveyances, he contends, are admitted
by the return, and make out a title in him to the middle
sprout.   The canal appraisers, so far from admitting the ti-
tle of the relator, expressly deny it.   They state that he ex-
hibited before them his conveyances, meaning, no doubt, the
conveyances mentioned in his affidavit, and also an exempli-
fied copy of the patent of Rensselaerwyck, as a necessary
link in his chain of title.   This patent is not set forth in the
affidavit of the relator, and we hear of it for the first time in
the return.   If we could look no farther back than the deed
from Van Rensselaer to Van Schoonhoven, and there was no
other evidence in the case, the relator might claim to have a
made out a title.   His affidavit goes no farther.   It does not
shew, as was shewn to the canal appraisers, that he claimed
under the patent of Rensselaerwyck.   This fact appears from
the return.   His title, therefore, depends not solely upon the
conveyances set forth in his affidavit and admitted by the re-
turn, but also upon the question whether the patent of the

manor of Rensselaerwyck comprehends the middle sprout ; and that depends on the location of the patent. They add that after carefully examining this patent with their knowledge of localities, they are clearly of the opinion that the middle sprout of the Mohawk is not embraced within the boundaries of the patent, and that the relator had entirely failed to make out any title to the middle sprout. They then proceed to assign their reasons why he has made out no title. Among other things they state, that before the execution of the deed from Van Rensselaer to Van Schoonhoven, the former disclaimed all title to the premises, and did not consider them included within his patent. Whether this disclaimer can be received in evidence to defeat the relator's title, or whether, were the case before a jury, it might, with other facts, be submitted to them to shew the practical location of the patent, it is not necessary now to determine.

NEW-YORK, Sept. 1830.

Canal Commissioners
v.
The People.

The question is whether the relator has established a title ? The mere exhibition of deeds of conveyance does not of itself make out a title. Had these deeds been introduced before a jury on a trial at law, they would have been received in evidence, because proved or duly acknowledged ; but the question of title would yet have remained open, until it was shewn that the patent by its practical location or otherwise comprehended the premises in question. The appraisers in their return admit no more than that those deeds were duly executed, but deny that they convey any title to the relator, because the patent under which he claims to derive his title, does not include the premises.

The court cannot reject any part of the return provided it is pertinent. If the relator intended to controvert it, he should have taken issue on it. This he has not done. He has not traversed the return, neither has he demurred to it ; unless his application for a peremptory mandamus be considered equivalent to a demurrer. If so, then the facts in the return are admitted, and it is now too late to controvert them. In this point of view then, how does the case stand ? We are not to presume that the relator has made out a title merely because he has set forth his conveyances in his affidavit.

The court can look only to the return. When that comes in, the affidavit has performed its office, and the return alone contains the facts on which the question is to be decided.

The relator is bound to make out his case affirmatively. How is this to be done? In the first place he should have presented to the appraisers, not only the exemplified copy of the patent, and the conveyances from Van Rensselaer down to himself, but he should also have offered evidence before them of the location of the patent, so as to shew, that in point of fact, it comprehended the premises in question. If, after this, they refused to allow him damages, the supreme court, on affidavit of these facts, would have ordered an alternative mandamus. If their return to this writ were not full and ample, he could, on application to the court, have compelled a farther return. If it were untrue, he could have traversed it. But, unless the return itself, if it be not traversed, shews sufficient to entitle the relator to damages, a peremptory mandamus cannot be awarded; for the court can look to nothing else.

The question therefore is, whether the return contains sufficient to authorize a peremptory mandamus? If not, then the appraisers have shewn cause why it should not issue. If the relator is entitled to damages, he has it in his power not only, but it is his duty to shew it. The statute makes ample provision for this. The act, 1 *R. L.* 107, provides that when a return is made to a *mandamus*, it shall be lawful for the person suing or prosecuting such writ to plead to or traverse all or any of the material facts contained within the return; to which the person making the return shall reply, take issue or demur, &c.; and if a verdict shall be found for the person suing out the writ, or judgment shall be given for him upon the demurrer, &c. he shall recover his damages and costs. The affidavit of the relator contains nothing in relation to the actual location of the patent; neither does the return, except a denial that the patent covers the middle sprout; but it contains all the facts that the appraisers were bound to state. They too are alleged in broad terms, and are, in my opinion, sufficient to justify the appraisers in refusing to assess damages. If the relator did not intend to

controvert them he should have demurred. This was held to be the correct practice in the case of *The People, ex rel. Shaut,* v. *Champion and others, Commissioners of Highways of Danube,* 16 *Johns. R.* 61. To the return of the commissioners in that case there was a demurrer ; on the argument it was objected that it was irregular for the *relator* to demur to the return, but *Spencer,* justice, said, "The act authorizes the party prosecuting to demur ; for a demurrer is a plea, and it would be absurd to require a traverse of the return, when the facts are truly stated." The same principle has since been recognized by the supreme court in the case of *The People* v. *The Judges of Jefferson county,* 2 *Wendell,* 301. *Marcy,* justice, says, "Even this court, on the coming in of the return, were not prepared to say that a peremptory mandamus ought to issue, but directed the relators to demur, so that the law of the case might be looked into."

The court cannot with safety adjudicate on such important rights as are involved in this case, unless they are presented more fully and in a more definite and tangible shape. The return itself shews that it was never contemplated that a question of this magnitude was to be determined in this informal manner ; for the appraisers in conclusion say, " it is hoped that the hasty suggestions which have been made will indicate the propriety of a more careful investigation and solemn decision than can be obtained on the *ex parte* application of interested individuals."

The correct rule undoubtedly is, that when a return is made to a *mandamus,* the person suing or prosecuting the writ should either plead to or traverse the facts contained in the return. In the present case the relator should have demurred, if the facts were not disputed, or he should have traversd them, if he intended to controvert them. Not having done either, the most favorable light for him in which the case can be viewed, is to consider his application for a peremptory mandamus equivalent to a demurrer. If so, the facts in the return are admitted, and the relator's title is not established. Had he not considered the facts truly stated, he had it in his power to traverse the return and carry the cause to a jury for their investigation, where the vast variety

NEW-YORK,
Sept. 1830.

Canal Com-
missioners
v.
The People.

of facts which must necessarily exist in relation to the location of this patent might have been definitely and legally presented.    After their determination, the supreme court could have done justice to the relator according to the precise ascertainment of his rights.    As it is, we are left altogether to conjecture as to the correct location of the patent ; the return, if it does not absolutely shew the title out of the relator, certainly does not shew it in him ; and this question being entirely unsettled and undetermined from aught that appears in the case, and the relator having failed to traverse the return, it appears to me that he has not brought himself within the act to entitle him to damages.

My opinion therefore is, that the order of the supreme court granting a peremptory mandamus ought to be reversed and annulled.    This being done, I see no objection to giving leave to the relator to traverse the return to the alternative mandamus.

On the question, Shall the rule or order of the supreme court allowing the writ of mandamus in this case be reversed ? the members of the court voted as follows :

For *affirmance*—The CHANCELLOR, and Senators ALLEN, BOUGHTON, BRONSON, and OLIVER—5.

For *reversal*—Senators ARMSTRONG, BEARDSLEY, BENTON, CONKLING, DEITZ, ENOS, GERE, HUBBARD, MATHER, MAYNARD, McLEAN, McMARTIN, REXFORD, SHERMAN, TALLMADGE, THROOP, TODD, WARREN, WHEELER, and WOODWARD—20.

Whereupon the order of the supreme court was *reversed*, with leave to the relator to plead.