MORTIMER et al. v. NEW YORK EL. R. CO. et al.

(Superior Court of New York City, General Term. August 19, 1889.)

1. CONFLICT OF LAWS—DUTCH OCCUPATION OF NEW YORK.
   The city of New York, though occupied by the Dutch, was always English territory; and hence the "Bowery," a street alleged to have been dedicated during the Dutch occupancy, is governed by the rules of the common law, and not by the civil law, as to the rights of abutting owners.

2. STREETS—RIGHTS OF ABUTTING OWNER.
   An owner of land abutting on the Bowery is entitled to easements of light, air, and access, including the benefit derivable from the use of the front of his property by the erection of signs thereon, and may recover for injuries to those rights arising from the construction of an elevated railroad on the street.[1]

3. SAME—BURDEN OF PROOF.
   In an action for such injuries, plaintiffs having recovered in the trial court, the burden of showing that the judgment is erroneous on appeal is on defendants.

4. SAME—HARMLESS ERROR.
   The error, if any, in permitting plaintiffs in such an action to prove that their tenant demanded a decrease in the rent of the premises, on account of the construction of the railroad, the amount of decrease not being shown, is cured if the court charges the jury not to consider the abatement of rent for any purpose.

Appeal from jury term.

Action by William Y. Mortimer and Richard Mortimer, executors, etc., of Richard Mortimer, deceased, against the New York Elevated Railroad Company and the Manhattan Railway Company, to recover for injuries done to plaintiffs' land by the construction and operation of an elevated railroad on the adjacent street. Verdict and judgment for plaintiffs, and defendants appeal.

Argued before FREEDMAN and TRUAX, JJ.

Davies & Rapallo, for appellants. John W. Pirsson, (John E. Parsons and John A. Bell, of counsel,) for respondents.

TRUAX, J. The learned counsel for the appellants contend in this case, as they have often contended in other cases of a like nature, that, prior to 1664, the land included in the Bowery was owned absolutely in fee by the Dutch government of this island; and that, for that reason, abutting property owners had and have no right or interest in the land embraced within the limits of the street on which their premises abut. I shall show that the Dutch never owned the fee in the street, and that it never was admitted by the English government that they did own the fee in the street. The civilized powers of Europe claim America by the right of discovery, and it was the international law of the time that the absolute rights of property and dominion to the soil of this country belonged to the European nation by which that particular portion of the country was first discovered. Martin v. Waddell, 16 Pet. 367; Story, Const. §§ 1, 2. The English always claimed this portion of North America by right of the prior discovery of the country by John and Sebastian Cabot. The elder Cabot, who at that time was in the employ of Henry VII. of England, reached the main-land before Columbus himself. The English claimed, and began to claim shortly after this time, that the Cabots had visited the whole coast from Florida up to Labrador, and had thus acquired for England a title which superseded that of Spain. It is stated in the account of Gilbert's voyage, which is contained in Hakluyt's Collection of Voyages, which account was written by Mr. Edward Hayes about the year 1583, that "the first discovery of these coasts (never heard of before) was well begun by

---

[1] Concerning the rights of owners of land abutting on a street in which railroad tracks are laid to compensation for damages occasioned thereby, see Adams v. Railroad Co., (Minn.) 39 N. W. Rep. 629, and note; Railroad Co. v. Larson, (Kan.) 19 Pac. Rep. 661, and note; Railroad Co. v. Walsh, (Pa.) 17 Atl. Rep. 186, and note; Appeal of Beidler, Id. 244; Railway Co. v. Hazels. (Neb.) 42 N. W. Rep. 93.

John Cabot, the father, and Sebastian, his son, an Englishman born, who were the first finders out of all that great tract of land stretching from the cape of Florida unto those islands which we now call the 'New Found Land,' all which they brought and annexed unto the crown of England." It is also stated that, "not long after Christopher Columbus had discovered the islands and continent of the West Indies for Spain, John and Sebastian Cabot made discovery also of the rest, from Florida northwards, to the behoof of England. Then, seeing the English nation only hath right unto these countries of America from the Cape of Florida northwards, by the privilege of first discovery, unto which Cabot was authorized by legal authority, and set forth by the expense of our late famous king, Henry VII., which right also seemeth strongly defended on our behalf by the powerful hand of Almighty God, withstanding the enterprises of other nations, it may greatly encourage us upon so just grounds, as is our right, and upon so sacred an intent as to plant religion, (our right and intent being meet foundations for the same,) to prosecute effectually the full possession of those so ample and pleasant countries appertaining unto the crown of England." The extract from Hakluyt that I have given may be found in Voyages of the Elizabethan Seaman to America, edited by E. J. Payne, printed in London in 1880.

In 1496, on the 5th of March, a patent was issued by Henry VII. licensing John Cabot and his three sons, or either of them, their heirs or assigns, to search for islands, provinces, or regions in the eastern, western, or northern seas, and, as vassals of the king, to occupy the territories that might be found, with an exclusive right to their commerce, on paying the king a fifth part of all profits. It was while acting under this license that Cabot is said to have discovered the continent of North America. In 1498, Sebastian Cabot sailed westward until he came to what is now Newfoundland. From there he proceeded to the main-land, made several landings, dealt with the natives, and followed the coast southward probably as far as the Chesapeake bay. Things remained in this state until the latter part of the sixteenth century, when certain concessions were made to Walter Raleigh and others. In 1606, James I. granted a charter,—the first colonial charter under which the English were planted in America. By that charter the territory from Cape Fear to Halifax, excepting, perhaps, a little spot in Acadia, then actually possessed by the French, was set apart to be colonized by two rival companies. At this time the Dutch had made no voyage to America, except that in 1597 they trafficked with the West Indies.

In fact, it is stated in Wassenaei's Historie van Europa (Amsterdam) that "numerous voyages realized so much profit for the adventurers that they discover other countries, which they afterwards settle and plant. Virginia, a country lying in $42\frac{1}{2}$ degrees, is one of these. It was first peopled by the French; afterwards by the English; and is to-day (1624) a flourishing colony. The lords states general, observing the great abundance of their people, as well as their desire to plant other lands, allowed the West India Company to settle that same country." Between 1609 and 1622 the Dutch traded with the Indians in this country, and had a trading post on Manhattan island. In the year 1620, James I. issued a new patent, conferring on the patentees in absolute property, with unlimited jurisdiction, the territory from the fortieth to the forty-eighth degree of north latitude, and in length from the Atlantic to the Pacific. "Without the leave of the council of Plymouth, not a ship might sail into a harbor from Newfoundland to the latitude of Philadelphia; not a skin might be purchased in the interior; not a fish might be caught on the coast; not an emigrant might tread the soil." Bancroft's History of America, c. 8. In 1622 the Dutch took measures looking towards planting a colony here, and in that year the English minister at the Hague demanded that the enterprise of planting a Dutch colony upon the Hudson should be abandoned. This demand or request of the English minister was disregarded;

but in 1627 Gov. Bradford, of Plymouth, gave notice to Peter Minuit, the then governor of New Netherlands, that the patent of New England extended to latitude 40, and that the Dutch had no right to plant and trade north of that line. At the very time the Dutch settled on Manhattan island the English had flourishing colonies,—one southward on the James river, the other northward at Plymouth. "Colonization on the Hudson," says Bancroft in his History of the United States, c. 15, "was neither the motive nor the main object of the establishment of the Dutch West India countries. The territory was not described, either in the charter or at that time in any public acts of the states general, which neither made formal specific grant nor offered to guaranty the possession of a single foot of land."

In 1632 the ship in which Gov. Minuit embarked for Holland was driven into Plymouth by the weather, and was there detained for a time, on the allegation that it had traded without license in a part of the dominions of the king of England, interloping between the plantations of Virginia and New England. Valentine's History, p. 152. In 1663 Gov. Stuyvesant went to Boston to complain of the encroachments made by the people of Massachusetts and Connecticut,—to remonstrate against such encroachments. In the words of Bancroft from the chapter above cited: "An embassy to Hartford renewed the language of remonstrance with no better success. Did the Dutch assert their original grant from the states general, it was interpreted as conveying no more than a commercial privilege. Did they plead discovery, purchase from the natives, and long possession, it was replied that Connecticut, by its charter, extended to the Pacific. 'Where, then,' demanded the Dutch negotiators, ' where is the New Netherland?' And the agents of Connecticut, with provoking indifference, replied, ' We don't know.'" On the 12th of March, 1664, certain letters patent, duly executed, were granted by Charles II., king of England, to James, duke of York. These letters patent stated: "For divers good causes and considerations us moving thereunto, and having of our special grace * * * given and granted, and by these presents for us, our heirs and successors, do give and grant, unto our dearest brother, James, duke of York, his heirs and assigns, all that part of the main-land of New England, beginning at a certain place called or known by the name of 'St. Croix,' next adjoining to New Scotland, in America. * * * And also all that island or islands commonly called by the several name or names of ' Matowacks,' or 'Long Island,' situate, lying, and being towards the west of Cape Cod and the narrow Higansetts, and abutting upon the main-land between the two rivers there, called or known by the several names of 'Connecticut,' or 'Hudson' rivers, together, also, with the said river called 'Hudson River,' and the lands from the west side of Connecticut to the east side of Delaware bay; * * * together with all the lands, islands, * * * to have and to hold all and singular the said lands, islands, hereditaments, and premises, with their and every of their appurtenances hereby given and granted, or hereinbefore mentioned to be given and granted, unto our dearest brother, James, duke of York, his heirs and assigns forever; to be holden of us, our heirs and successors, as of our manor of East Greenwich, in our county of Kent." This grant was confirmed to the duke of York by a subsequent grant from King Charles II., dated the 29th day of June, 1674, which was made for the purpose of removing doubts which had then arisen as to the validity of the first. It was provided in these grants that the statutes, ordinances, etc., established by the duke of York should not be contrary to, but as nearly as might be agreeable to, the laws, statutes, and government of the realm of England. Such was the condition of affairs, and such the claim made by the English, up to and at the time they took possession of what was then known as "New Netherland."

The English commissioners, in their letter to Gov. Stuyvesant demanding possession of Manhattan island, say that the right of the king of England to

the land occupied by the Dutch was unquestionable. In other words, they demanded the country because it belonged to the English, and not the Dutch. It is stated in chapter 3, § 6, of Harris' Voyages, published at London in 1705, that the colony of New York was English by a double right, namely, the right of discovery and of conquest. It was, says the writer, undoubtedly part of the country the coasts of which were first viewed by Sebastian Cabot, and as such made a part of the original province of Virginia, and was afterwards within the limits of the country granted by King James to the Western Company; but before it could be settled the famous navigator, Hudson, discovered that river which has since borne his name and the country adjacent, which he afterwards sold to the Dutch, who planted there. But this was looked upon as illegal, because they had not King James' license, which, it seems, they afterwards obtained. And Burke states, in his account of the European settlement in America, (London, 1760,) that we—that is, the English—derive our rights in America from the discovery of Sebastian Cabot, who first made the northern continent in 1497. The fact is sufficiently certain to establish our rights to our settlements in North America. And so it has been stated by Lossing, in his Encyclopædia of United States History; by Roberts, in his volume on New York in the American Commonwealth series; by Mr. Fernon, the custodian of the Dutch records in the state library, in his article on New Netherland in the narrative and critical History of America; also by Mr. Gerard in his Titles to Real Estate, and by the supreme court of the United States in the case of *Martin* v. *Waddell*, 16 Pet. 408, where it is said: "The right of the king to make this grant, with all of its prerogatives and powers of government, cannot, at this day, be questioned. But, in order to enable us to determine the nature and extent of the interest which it conveyed to the duke, it is proper to inquire into the character of the right claimed by the British crown in the country discovered by its subjects on this continent, and the principles upon which it was parceled out and granted. The English possessions in America were not claimed by right of conquest, but by right of discovery; for, according to the principles of international law as then understood by the then civilized powers of Europe, the Indian tribes in the new world were regarded as mere temporary occupants of the soil, and the absolute rights of property and dominion were held to belong to the European nation by which any particular portion of the country was first discovered. Whatever forbearance may have been sometimes practiced towards the unfortunate aborigines, either from humanity or policy, yet the territory they occupied was disposed of by the governments of Europe at their pleasure, as if it had been found without inhabitants. The grant to the duke of York, therefore, was not of lands won by the sword; nor were the government or laws he was authorized to establish intended for a conquered people."

It is true that this was said in reference to lands situated within the limits of the state of New Jersey, but it must be remembered that the Dutch not only claimed what is now known as "New York," but they also claimed the territory embraced within the present limits of the states of Delaware and New Jersey. Their outposts, in fact, ran from the Connecticut river to the Delaware river. And for the reason that the Dutch claimed the territory which now makes part of New Jersey, the remarks of the supreme court of the United States in *Martin* v. *Waddell* are as well applicable to land within New York as within New Jersey. It was also stated in the case of *Martin* v. *Waddell* that "the country mentioned in letters patent was held by the king in his public and regal character, as the representative of the nation, and in trust for them. The discoveries made by persons acting under the authority of the government were for the benefit of the nation; and the crown, according to the principles of the British constitution, was the proper organ to dispose of the public domains; and upon these principles rest the various charters and

grants of territory made of this continent." It is true that the Dutch, in 1629, bought, or claimed to buy, from the Indians Manhattan island; but this alleged purchase gave them no title, for it has been held that a purchase from the Indians could not give a title, and such a purchase cannot be recognized in the courts of the United States. *Johnson* v. *McIntosh*, 8 Wheat. 543; *U. S.* v. *Rillieux's Heirs*, Id. 189. The rule, however, is different in Florida, to which country the English never claimed title by right of discovery. They simply acquired their title to that land by treaty. *Mitchel* v. *U. S.*, 9 Pet. 712.

I am of the opinion that the fee of the Bowery, and of the other streets in the city of New York that are known as Dutch streets, never was in the Dutch government; and that it was, prior to the Revolution, bound by the rules of the common law, and not by the rules of the Dutch civil law. While the Dutch were in actual possession this execution of the common law was suspended, just as, during the late Rebellion, this execution of the laws of the United States could not be enforced in some of the southern states. But, said the supreme court of the United States in *Ketchum* v. *Buckley*, 99 U. S. 188, "the same general form of government, the same general law for the administration of justice and the protection of private rights which had existed in the states prior to the Rebellion, remained during its continuance and afterwards."

The learned counsel for the defendants contend that by the Dutch civil law streets and highways were owned absolutely by the state, and abutting owners had no private right or property in them whatever. Whatever may have been the terms of the Dutch civil law in that respect, I wish to call attention to an order made at a meeting of the lord director general and lord councilors of New Netherland, held on the 25th day of February, 1656. This order is the first order in point of time relating to the streets of New Netherland, and presumptively was made in accordance with the laws that were then in force in New Netherland. This order is to be found in volume 2 of the Records of the Burgomasters and Schepens, p. 362. This order recites "that, having this day resumed the survey of the streets of the city as they heretofore, in the assembly of the director general and councilors of New Netherland, were designed in the map or plan, and laid out or set off into streets, with palisades according to the same, the director general and council confirmed forever the survey aforesaid, without changing the same. Therefore the advancement of the same referred to the burgomasters of the city. They were directed to affix a notice, and determine a time at which all and any who might be abridged or injured by the aforesaid survey should inform the burgomasters of the extent of their damage, and to agree, for the advantage of the city, on the lowest price. If they could not agree, then to refer the same to two or three honest persons, not interested." The order also provided that the owners should remain in possession of the lots falling without the lines of the streets until they are paid therefor according to valuation. This is very much like the modern method of taking property for street purposes. This, says Gerard, in his treatise on the Title of the Corporation to the Streets, p. 129, "raises the presumption, at least, that where land was taken for a street satisfaction to the owners had been made for the road-way taken, or at any rate for the public easement established." So it seems to have been considered at that time, for damages were awarded, in 1656 and 1657, to various persons, "for what has formerly been cut off." From this order, and from these proceedings, it seems clear that the authorities of New Netherland, in 1656 and 1657, did recognize the private rights of abutting owners, and therefore, if the Bowery was a street or road in 1656, or prior to 1664, the rights of an owner of property abutting on the Bowery were recognized by this order. I have said "if the Bowery was a street or road in 1656" because the evidence in the case on that point is not very conclusive. In fact no evidence

on that point has been presented to this general term. We have before us only two of defendants' exhibits,—the one the ground brief of Gov. Kieff in 1645; and the other the confirmation thereof by Gov. Nicolls in 1667. It is true that in the grant by Gov. Kieff the "Bowery" is mentioned, but that word did not then mean what we know as the "Bowery," but meant a "farm." Mention is made in the grant of "Paunebacker's Bowery" and of "Jacobsen's Bowery." The obligation of showing that the trial judge erred rests with the appellants.

The alleged errors of the trial judge are presented to this court by exceptions to the admission of testimony, and by exceptions to the charge of the trial judge and to the refusals to charge as requested by defendants. Following the decision of this court in *Abendroth* v. *Railway Co.*, 54 N. Y. Super. Ct. 417, and for the further reasons assigned in this opinion, we are of the opinion that the trial judge did not err in charging that the plaintiffs had an easement of light, air, and access. Of the same general nature is the right to put signs on a building, and the owner of property is injured in his property rights to a greater or lesser extent when such a right is taken from him. The questions presented by the refusals to charge have been so frequently decided by this court adversely to the claim of the defendants that it is not worth while to call the attention of counsel to the decision. And so it is with regard to the question presented by the exception to the testimony showing that the owners of property mentioned in the complaint herein had paid assessments for paving the Bowery.

Certain questions were asked one of plaintiffs' witnesses, to which the defendants objected, and, their objection being overruled, excepted. These (the questions) tended to show that the Bowery as now laid out was not a Dutch street or road. We are of the opinion that defendants were not hurt by this ruling. We said in *Mortimer* v. *Railroad Co.*, 54 N. Y. Super. Ct. 322, that the appellants were bound to show affirmatively that an error had been committed. In that case, as in this, exhibits were offered at the trial which were not produced on the argument before the general term, and we then said, in effect, that these exhibits "may have, of themselves, been a sufficient ground" for the ruling. This case has lately been affirmed by the court of appeals. 20 N. E. Rep. 877.

The trial judge allowed, the defendants excepting, one of the witnesses called by plaintiffs to testify that a former tenant demanded, on the construction of the elevated railroad, a decrease in the rental that he was paying. The amount of the decrease was not shown, and the trial judge told the jury, at the request of the defendants, that they were "not to consider, for any purpose, that abatement" of rent, and that they must decide the question irrespective of that. This, we think, cured the error in the ruling, if there was any error. The judgment and order appealed from are affirmed, with costs.

FREEDMAN, J., (*concurring.*) The claim made in this case by and on behalf of the elevated railway companies is that the absolute fee of the street known as the "Bowery" was, prior to the surrender of the Dutch forces to the English in 1664, in the Dutch government; that such fee thereafter went to the state or to the city of New York so absolutely that abutting owners never had, and do not now have, any easement of any kind in said street, and that, the elevated railway running through the Bowery having been constructed with the consent of both the city and the state, neither its owners nor its lessees are liable for any injury inflicted upon abutting property by reason of the construction and operation of the railway.

The claim of the English that they were the owners, by right of discovery, under governmental authority, of the land of which the present city of New York forms a part, and that this gave them such exclusive ownership that the Dutch government acquired no title to the land which can be recognized,

has been fully set forth in the opinion of Judge TRUAX. I concur in his remarks as far as they go, but wish to add the following, viz.:

The claim of the English, it is true, has occasionally been criticised on the ground that neither of the Cabots landed in or near New York, or saw the coast of New York. The right of discovery is not recognized in the Roman law unless followed by occupation, or unless the intention of the sovereign or state to take possession be declared or made known to the world. And it must be conceded that modern diplomatists and publicists incline to the opinion that mere transient discovery amounts to nothing unless followed in a reasonable time by occupation and settlement, more or less permanent, under the sanction of the state. But the question in the case at bar is not to be decided according to the rules of the international law of the present time. It is a question purely between the public authorities of the state of New York and citizens of the same state, and as such it is controlled by the decisions referred to by Judge TRUAX, to the effect that what the English did do was sufficient to give them title by discovery, and that such title is superior to the Indian title. These decisions proceeded upon the theory that the claim of the Dutch was contested by the English from the very start, not because they questioned the title given by discovery, but because they insisted on being themselves the rightful claimants under that title; and that the claim of the English was finally decided in their favor by the sword. That being so, it follows that, in contemplation of present law, neither the Dutch nor the Roman law ever prevailed in the state of New York *de jure*, and that the common law of England must be deemed to be the original source of all our law. And it further follows that the foundations of the rights of owners of land abutting on a street laid out while the Dutch were in possession, as against the city or the state of New York, rest upon the English common law, and that they are not to be affected by the Dutch or Roman law.

Reported cases in which the validity of Dutch grants was upheld between individuals have no application to the present controversy. Now, under the English common law, the presumption is that the owners of lands lying on a highway are the owners of the fee of the highway; that the owners on each side of the highway own the soil of the highway in fee to the center of the highway; and that the rights of the public in and to the highway are no higher or other than those of a mere easement. *Wager* v. *Railroad Co.*, 25 N. Y. 529. This presumption applies as well to the streets of a city as to a country highway. *Bissell* v. *Railroad Co.*, 23 N. Y. 61. This presumption of law is founded on the supposition that the way was originally granted by the adjoining owners in equal proportions. *Watrous* v. *Southworth*, 5 Conn. 305. But the presumption may be rebutted by proof to the contrary, and it is rebutted by the production of a deed under which the owner derives title granting the land to the side of the street only. Under the operation of this rule, and there being no proof of alienation or escheat requiring a different conclusion, it must be assumed in this case that the original grantors from whom plaintiffs' title has been derived owned the soil of the Bowery in front of the premises in suit to the center of the street. But even if the title of the English rested not in discovery, but in conquest, and the English, upon the surrender by the Dutch in 1664, acquired from the Dutch a title to the then existing streets as absolute as under the Roman law the title of the government to a military highway was, the fact would not improve the position of the defendants. Upon receiving such title the English could do with it what they pleased. They were not bound to enforce it against abutting owners, as the Dutch government might have enforced it. The presumption is that they took the title and the streets to be held by them according to their own laws, and as matter of fact they thereafter so dealt with said streets as to admit of no other conclusion. The province having been granted by Charles II. to his brother, the duke of York, by the charter of 1664, several

months before the surrender to Sir Richard Nicolls, the grant, in order to remove all doubt as to its validity, was afterwards confirmed by the charter of 1674, also granted to the duke of York. The object of both charters was to enable the duke of York to plant a colony on this continent. The charter of 1664, issued under the great seal of England, contained a provision that the statutes, ordinances, etc., to be established by the duke in the new country, "should not be contrary to, but as nearly as might be agreeable to, the laws, statutes, and government of the realm of England." This charter was, therefore, in itself, an explicit declaration of the king's will that the laws of England should be established in the colony, and that the laws of the Dutch settlers should not be retained. The consequence was that, having obtained the lands, the English held them, not under the Dutch or the civil law, but under the common law of their own country. English law governed English land, so that, even if an absolute title to a street was obtained, the street was ever thereafter treated as an English street, under the common law. If, therefore, the crown, or subsequently the state or the city of New York, at any time owned both the land in the street and the land adjoining, and thereupon granted a piece of land bounded on the street as a street by a proper description, such a grant, under the principles of the common law, carried title to the center of the street; and if the piece of land was bounded, not on the street generally, but by the side of the street, the grantee acquired an easement in the street as regards light, air, and access, and no express grant or covenant for that purpose was necessary. As matter of fact, the duke of York ascended the throne of Great Britain as James II. in 1685, and the fee to the streets now in question remained in the British crown until 1686, when it passed from the crown by the Dongan charter. By that charter there was granted to the city of New York "all and every the streets, lanes, highways, and alleys within the city of New York and Manhattan island aforesaid, for the public use and service of the mayor, aldermen, and commonalty of the said city, and of the inhabitants of Manhattan's island aforesaid, and travelers there."

This grant was confirmed by the Montgomerie charter of 1730, and by various colonial laws. Upon the organization of the state of New York the said state, in its corporate and sovereign capacity, succeeded to all the rights of the crown in and to all the land within its territorial limits. By the act of October 22, 1779, (1 Greenl. Comp. p. 31, § 14,) all the property in all lands, and all the rights, titles, privileges, and royalties which belonged to the British crown on or before July 9, 1776, were declared to be vested in the people of the state. And by the act of March 7, 1793, § 3, re-enacted on April 9, 1813, (Laws 1813, c. 86, § 192,) the state transferred to the city all its estate, right, title, interest, claim, and demand in and to all lands "heretofore left for streets or highways" in the city of New York "for the use of streets and highways." Thus it will be seen that, although the city acquired a double title from the crown and the state to these old streets, the title is not absolute, but "for the public use and service of the mayor, aldermen, and commonalty of the said city, and of the inhabitants of Manhattan's island aforesaid, and travelers there," and "for the use of streets and highways." The words "for the public use * * * of the inhabitants of Manhattan's island, and of travelers there" are quite significant. They contemplate use by two different classes of persons. The right of use by a traveler consists in the right to pass over and through the streets. The right of use to be enjoyed by the inhabitants consists in the right to use a street for all purposes for which a public street can properly be used, and one of those rights is the right to build upon and along the side of the street, and to have light and air and access from the street. These different uses can be harmonized, and they have always been recognized by the legislature of the state and by the corporation of the city of New York. As matter of fact all the streets in the

city of New York always existed as much for the benefit of the occupants of the houses built along the sides of the streets as for the benefit of the general public, and new streets were opened and constructed from time to time, according to the demands of building necessities. Building always preceded travel. If the upper parts of the city had not been built up so rapidly that the means of communication with the lower parts became insufficient, there would have been no demand for rapid transit, and the elevated railways would not have come into existence. But there never was at any time any necessity in the city of New York for a military road or highway as known to the Roman law. The streets of the city grew as commercial requirements dictated. On each side of every street now existing there is a sidewalk for the passage of pedestrians, and between the sidewalks there is a carriage way for the passage of vehicles. The width of each street is fixed by law, and the common council of the city always had the power, subject to certain limitations, to regulate, by ordinance, the use of the streets and of the sidewalks. In the exercise of this power the common council, by ordinances, which have repeatedly been recognized by the legislature, allowed on each sidewalk a so-called "stoop-line," and within such stoop-line stoops, areas, and steps descending into the cellar or basement were constructed by the owners of the adjacent houses. Under another ordinance many abutting owners purchased from the city the right to build vaults under the sidewalks of their respective premises, and built vaults upon the faith of such purchases, and many of these vaults have become very valuable. Sewers were constructed through the streets, and all houses along the lines of the street were connected with such sewers, and the owners of the houses were assessed for the cost of the sewers on the theory that their property had been benefited by the construction. So, when the streets were paved, the expense was in like manner assessed upon the abutting property. Moreover, water, gas, steam, and electric lights are now supplied to houses through pipes running through the streets. These matters sufficiently show the uniform and settled policy of the city and the state, with respect to houses built upon and along the lines of the streets. No discrimination was ever made by reason of the fact that a certain street was an old Dutch street.

How, then, can it be successfully claimed at the present time that in any street which once was a Dutch street the city of New York, or the state, or both together, may rightfully, and without making any compensation whatever, cut off all projections from the house-lines into the street, deprive the houses built upon and along both sides of the street of all benefits derived from the street, and then, if they see fit, build a solid wall against the house-line on each side of the street, sufficient to shut up the occupants completely in their respective houses? This is precisely what the claim of the elevated railway companies amounts to, although milder language has been used in its presentation. The bare statement of the claim demonstrates its absurdity. It should also be observed that the defendants have failed to show that the dimensions and the location of the road known as the "Bowery" during the Dutch occupation were identical with the dimensions and the location of the Bowery of the present time. According to the proof, the width of the Dutch roads in New York was about three Dutch rods, whereas the present Bowery is much wider. For all that appears, the latter may have been laid out under English law. From what has already been said it sufficiently appears that the rights of the plaintiffs to the use and enjoyment of the Bowery are in no way or manner affected by the question whether that street was laid out by the Dutch or the English. That being so, it is just as immaterial in this case as it was held to be in the *Story Case*, 90 N. Y. 122, whether the present plaintiffs own the fee to the center of the street, subject to the use of the public, or whether the fee of the bed of the street is in the city of New York, in trust, for the purposes of a street, and the plaintiffs have only an

easement in the street as regards light, air, and access, for in either case the measure of damages is the same. If, therefore, the plaintiffs are considered as having only an easement, the case is still controlled by the adjudications already had to the effect that such an easement is private property, and that such property cannot be taken or impaired, even for a public purpose, without compensation. The exceptions relating to questions of evidence, the charge, and the refusal to charge have all been duly considered, and I concur with Judge TRUAX that none of them disclose any grounds for reversal. The judgment and order should be affirmed, with costs.