CHARLES S. HINE, APPELLANT, *v.* THE NEW YORK ELEVATED RAILROAD COMPANY, RESPONDENT.

*Streets in New York city, which were highways at the time of the Dutch occupation — rights of abutting owners therein.*

If it be conceded that under the treaties made at the time of the capitulation of August 27, 1664, the treaties of Breda of July 21–31 of 1667, and of Westminster of February 9–19, 1674, between the English government and the Dutch authorities, and the action of the State's general of April 16, 1674, the absolute ownership of the land forming the bed of certain of the streets in the city of New York, existing as highways at that time, may be vested in the sovereign power, it is also the fact that the right to the enjoyment of light and air; and access, whilst the highways continue, also exist in the abutting owners.

Although such absolute ownership in the land or soil of the highway might belong to the sovereign power, and revert to it when the highway is abandoned or closed, nevertheless, while it remains open the public, including the adjacent abutting owners, are entitled to all the advantages secured by its existence.

APPEAL, by the plaintiff, from a judgment rendered at the New York Circuit, and entered in the office of the clerk of the county of New York, April 1, 1886, dismissing the complaint.

*Wm. H. Arnoux*, for the appellant.

*Davies & Rapallo*, for the respondent.

BRADY, J.:

The plaintiff brought this action to recover damages alleged to have been sustained by reason of the manner in which the defendant built, constructed and operated its railway. The details given in the complaint were that the engines used constantly emitted noxious gases, odors, smoke, steam, coal-dust and cinders, which passed into and through the plaintiff's building, to the great discomfort of the occupants; and, further, that to exclude the odors and gases mentioned and to lessen the noises occasioned by the passage of the defendants' engines and cars, it was necessary to keep the windows of the plaintiff's building shut; that he had been unable to remedy the evils stated, and, in consequence, the beneficial use and enjoyment of his property had been greatly damaged and its value greatly reduced. The defendant denied that the plaintiff had any right, interest, easement, privileges or benefits in the street known as the Bowery, and in which plaintiff's property is located,

other than the right of passage, and alleged that such right was not interfered with. It also denied the emission of gases, odors, smoke, steam, coal-dust or cinders which passed through the building of the plaintiff; denied that the plaintiff was obliged to keep the windows of the building shut, as alleged, in reference to such elements and that the plaintiff had sustained damages by its wrongful acts. The defendant then alleged that it was duly organized under the acts of the legislature set out; that it had authority to build the railway and to equip the same with locomotives for use thereon, and that such construction and use had been made in the most skillful and careful manner in which it was possible to operate an elevated railway in the streets of this city.

Upon the trial the plaintiff put in evidence a warranty deed granting the *locus in quo* to the plaintiff, and then gave evidence tending to show that the rental value of the premises was injured by the construction and operation of the defendant's railway in its effect upon their light, air and access to them, to the extent of $2,500 a year, and that they were thereby injured in value to the extent of $20,000, and rested.

Defendant's counsel put in evidence act of 1866, chapter 697. Also put in evidence articles of association of the West Side and Yonkers Patent Railway Company. Also put in evidence the following acts: Act of 1867, chapter 489, and act of 1868, chapter 855 Also put in evidence appointment of commissioners of the Croton aqueduct department by the governor, pursuant to the requirements of the aforesaid acts. Also put in evidence supplemental articles of association of the West Side and Yonkers Railway Company, changing the name of the company. Also put in evidence a mortgage given by the company and foreclosure proceedings under the mortgage given by the company, and the deeds of the property and franchises of the company to the New York Elevated Railroad Company, and the permission of the commissioners so appointed to use dummy engines. Also put in evidence approval by the commissioners of the location and the plans of the structure, stations, and so forth, of the defendant road, and the resolutions connected therewith. Also put in evidence articles of association of the New York Elevated Railroad Company, act of 1875, chapter 595; also, act of 1875, chapter 606; also, appointment of commissioners by the

mayor under chapter 606 of the Laws of 1875. Also put in evidence the plan of the route designated by the commissioners, and the conditions and requirements imposed by the commissioners, with the resolution relating to the same. Also put in evidence proceedings in the Supreme Court giving consent to the construction and the operation of the New York Elevated Railroad, including the order in said proceedings. Also put in evidence resolutions of the board of aldermen, with the approval by the mayor, consenting to the route so designated. Also put in evidence the lease of the New York Elevated Railroad Company to the Manhattan Company in 1879, and the subsequent lease of 1884 by the same company to the Manhattan Company.

Defendant's counsel then put in evidence a stipulation as to the description of the property taken in this case, marked Exhibit No. 1.

## NEW YORK SUPREME COURT.

| CHARLES S. HINE<br>*against*<br>THE NEW YORK ELEVATED RAIL-<br>ROAD COMPANY. |
| --- |

It is hereby stipulated by the parties to this action, for the purpose of any future trial of the same, that the diagram, marked A, signed by the counsel hereto, correctly represents the length and position of the boundary lines, according to survey, of the lot No. 13 Bowery, which is described in a deed made February 1, 1855, by Thomas Ward and wife to Charles S. Hine; the figures upon said diagram correctly stating the length of the respective boundary lines in feet and inches, the distance from the north-east corner of said lot along the northerly boundary line to the easterly line of the Bowery, being, by measurement, one hundred and six feet six inches, and the distance from the south-easterly corner of said lot along the southerly boundary line to the easterly line of the Bowery, being, by measurement, one hundred and ten feet nine inches.

Dated, N. Y., *March* 24, 1886.

ARNOUX, RITCH & WOODFORD,
*Attorneys for Plaintiff.*
DAVIES & RAPALLO,
*Attorneys for Defendant.*

Also put in evidence Valentine's History of New York from 1609, volume 1, pages 30, 31, 69 and 70. Also put in evidence Hoffman's Appendix to the Estate and the Rights of the Corporation of New York, volume 2, the grants mentioned in pages 214, 242, 237, 226, 238 and 193. Also put in evidence map of ancient Bowery, being diagram No. 14, in Hoffman's Appendix, page 226. Also put in evidence page 236 of Hoffman's Appendix and the grant made in 1645, made by Governor Keefe to Classen; also, grant dated in 1653, of the same property from Classen to Beekman; also, grant made in 1667. Also put in evidence deed dated 1784, recorded in Liber 54, page 348, from Isaac Stoutenburg and others, commissioners in forfeiture, to John W. McKesson, letters of administration on the estate of John W. McKesson, recorded in the surrogate's office, in Liber 5, page 246; records of the Court of Common Pleas containing the proceedings in the partition of the real estate of said McKesson; order of said court dated January 6, 1801, appointing commissioners to make partition; deed of the commissioners to Smith Hicks, recorded in Liber 79 of Conveyances, page 39; deed from Smith Hicks to Anna Gearadt, recorded in Liber 85 of Conveyances, page 93; deed from Anna Gearadt to Henry T. C. Feltus, recorded in Liber 180 of Conveyances, page 52; the last will and testament of Henry T. C. Feltus, recorded in the surrogate's office, in Liber 62, page 372; letters testamentary and deed of executors, recorded in Liber 328 of Conveyances, 570, to Jacob Lorillard, conveying the same property; last will and testament of Jacob Lorillard, recorded in the surrogate's office in Liber 79 of Wills, page 104; deed of Margaret Anna Lorillard, recorded in Liber 447 of Conveyances, page 574, to Jacob Lorillard, Jr., and others; letters testamentary on the estate of Margaret Anna Lorillard, issued to Albon P. Man, dated December 3, 1846; deed recorded in Liber 486, page 38; deed of partition recorded in Liber 488 of Conveyances, page 245, deed from Thomas Ward to the plaintiff.

"The deed from Isaac Stoughtenburgh, Liber 54, page 348, to John McKesson, conveys a portion of the land designated on diagram No. 14 of Hoffman (supra), as E. Bowery, No. 5, the description being "bounded westerly by the Bowery Lane," etc. The foregoing chain of title conveys the same property down to the plaintiff's grantors Thomas Ward and Margaret H. his wife, except

that the description in deed of partition (*supra*), Liber 488, page 245, is as follows: "Bounded westerly in front by the Bowery * * * containing in width twenty-four feet five inches in front, and twenty feet eight inches in the rear, and in length on the north side one hundred and six feet six inches, and on the south side one hundred and eleven feet, be the said several dimensions more or less." Also put in evidence terms of capitulations between the British and the Dutch government in 1664, which appear in Hoffman's Estates, etc., of the Corporation of New York (vol. 1, pp. 19 and 333). Also put in evidence the treaty of Breda, 1674, by which the terms of that capitulation were affirmed. Also put in evidence patent from the British Government to the duke of York. Also put in evidence the Dongan Charter of 1686, and the Montgomerie Charter of 1730. And thereupon, for the purposes of the following motions, the defendants rested their case.

And this "memorandum," so-called, was also placed before the court, as appears by the record.

Memorandum on treaties bearing upon the surrender of the Province of the New Netherlands to England.

The first document we meet is the articles of capitulation concluded on August 27, 1664, between the English government and Dutch authorities found in Colonial Documents 2, page 250. Article 1 provides that the States General or West India Company shall freely enjoy all farms and houses (except such as are in the forts), and that within six months they shall have full liberty to transport all arms and ammunition or else they shall be paid for them. Article 2 provides that all public houses shall continue for the use for which they are now used. Article 3 provides that all people shall continue free denizens and enjoy their lands, houses, goods and ships wheresoever they are within this country, and dispose of them as they please. Article 4 gives liberty to the citizens to remove themselves from the country. Article 5 guarantees free transportation to England, if so desired. Article 6 and 7 provide that intercourse and emigration between Holland and the colony shall be free. Article 8 guarantees liberty of conscience. Article 9 provides against Dutchmen being pressed in any war whatever. Article 10 provides that no soldiers shall be quartered on the inhabitants without compensation. Article 11 provides that

the Dutch here shall enjoy their own customs concerning their inheritances. Article 12 provides for the keeping of public documents by those in whose hands they are now. Article 13 provides that no judgment that has passed any judicate here shall be called in question, but an appeal is reserved to the State's general. Article 14 provides for the giving of passports. Article 15 provides that any public debt that has been incurred shall be paid. Article 16 provides that inferior magistrates shall be kept in office until new ones are elected. Article 17 provides that the Dutch law shall apply to all transactions entered into prior to this date. Article 18 provides for the continuation of duties under certain circumstances. Article 19 provides that the military shall march out with drums beating. Article 20 provides that if orders should come to redeliver the colony, it shall be done immediately. Article 21 provides that deputies are to be chosen by the town of Manhattan. Article 22 provides that those who have any property or any houses in the fort shall be allowed to slight the fortifications, and then shall enjoy all their houses as all people do where there is no fort. Article 23 provides for safe conduct to all soldiers who may want to go to Holland. The text of the treaty of Breda in the original Latin is to be found in Dumont Corps Diplomatique, volume 7, page 44. The date is 21–31 July, 1667.

The third section, after stating that all quarrels should be forgotten, goes on : " In order that this peace may rest on a firm foundation, and from this day every occasion of contention be removed, it is further agreed that each of the high contracting parties shall hold and possess with full right of sovereignty, property and possession (*cum plenario, jure summi imperii, proprietatis et possessionis*) all lands, islands, cities, forts, places and colonies which such party may have taken from the other party by force and arms, or in any other way, either during the war or at any other time, in such mode and manner as it occupied and possessed them on the 10–20 May last, none of these places being excepted."

When, afterwards, another war broke out between England and Holland, and the colony of New Netherlands had been reconquered by the Dutch, it was stipulated by the treaty, which put an end to the war, that the colony should be surrendered to England. This was done by virtue of a general clause of the treaty of Westminster. (Dumont Corps Diplomatique, vol. 7, p. 253, 9–19 Feb., 1674.)

The sixth clause of this treaty reads: "It is agreed and understood that all places, islands, cities, harbors, castles or forts taken by one of the contracting parties from the other from the time that the late unfortunate war broke out, either in Europe or elsewhere, up to the time above mentioned for the cessation of hostilities, shall be surrendered to their former lord and owner in the condition in which they shall be when this peace is concluded."

The seventh clause is as follows: "It is further agreed that the treaty of Breda concluded in the year 1667, and also all other treaties confirmed by the said treaty, be renewed and remain in full force in so far as they are not in contradiction with the present treaty." (The only treaty referred to in the treaty of Breda was a treaty of 1662.)

Shortly after the conclusion of the treaty, the States general, on the 16th of April, 1674, passed a resolution requesting the king of England " that he will allow the inhabitants of New Netherlands aforesaid, the enjoyment of their lands, bouweries and all their goods and rights which they possess in that country, or with the same right, privilege and freedom as the inhabitants above mentioned enjoyed previous to the aforesaid war." (2 Colonial Documents, 545.)

The testimony being thus closed, defendant's counsel moved to dismiss the complaint upon the following grounds.

1. That plaintiff has failed to prove facts sufficient to constitute a case.

2. That the plaintiff has failed to prove that he has or that there is appurtenant to his lot, any easement to light, air or access, or any property right in the street called Bowery; or that there is any right or easement to use the land forming the bed of that street, peculiar to himself or his lot, other than those he has a right to enjoy as one of the public.

3. That plaintiff has failed to prove that any property of his has been taken by defendant, by the erection or maintenance of the structure of the elevated road in said street, or the operation of trains thereon, and that there is no complaint or evidence of negligence on the part of the defendant.

4. That it appears that the land forming the bed of the Bowery in front of plaintiff's premises is owned by the State or city of New

York, in fee, and free from any covenant or trust for the benefit of the abutting owner; that the State or city has, through the treaties, charters and conveyances in evidence acquired the absolute title to said land originally vested in the Dutch government, which, by Dutch law, was free from any right or easement or residuary estate in the owner of the land abutting upon the street.

5. That plaintiff has not alleged ownership of any land forming the bed of the street, but has alleged the existence of an easement over said land, which precludes the idea of ownership of said land; that he has failed to prove the ownership of any land in the street, as his deed, taken in connection with the actual measurement of his lot, only carries title to the easterly side of Bowery, and that merely as an owner of abutting land, plaintiff has no property in the street.

6. That it appears from the pleadings and proof that the defendant has legislative authority and municipal consent to the construction and operation of its railroad through the Bowery past plaintiff's premises; that as no property of plaintiff has been taken and no damage been done by negligence, defendant cannot be held responsible for damage or injury (if any) inflicted upon plaintiff, incidental to the construction and operation of the road.

(Motion to dismiss complaint granted and plaintiff excepted. Plaintiff's counsel then asked the court for permission to go to the jury on the facts of the case, but this was refused, and the plaintiff excepted.)

The defendant's counsel, as his proofs and motion to dismiss foreshadowed, contends that, prior to 1664, the land forming the bed of the street in front of the *locus in quo* was owned absolutely by the Dutch government, was subject to the laws of that government in determining the rights of abutting owners, and being thus controlled, such owners had no right to the soil of the street, highway or road, either during its use or upon its discontinuance, except the right of passage, and, therefore, presented no existing right of easement or other legal element which had been invaded or disturbed.

They fortify this position by elaborate briefs, historically and legally replete, and display great research, the result no doubt of great industry, patience and devotion. The contention against the plaintiffs is, therefore, fully and ably presented, and it may be that,

notwithstanding the long period that has elapsed since our Dutch ancestors surrendered the possession of this island, whether it had been rightfully or wrongfully obtained, their laws still prevail to the detriment of its citizens who reside here, and who are supposed to possess an absolute right to those incidents of ownership and possession along the line of a public thoroughfare, which are the enjoyment of light, air and access; and it matters not whether these elements be called easements or appurtenances, rights or incidents.

The question, however, evolved from the documents, treaties, charters and laws arrayed against the plaintiff's right of action has been recently examined and determined against the defendant by the Superior Court of this city in the Case of *Mortimer* v. *New York Elevated Railway Company* (6 N. Y. Supplement, 808), and in which comprehensive and satisfactory opinions were delivered by Justices TRUAX and FREEDMAN. The subjects embraced, indeed involved, in the ancient history of this island and its owners, by right of discovery or conquest, are very attractive and naturally excite the desire, if not the ambition, to give them exhaustive exposition, even though it have been done by others, but, nevertheless, the attraction will be resisted, and reliance, as already suggested, be placed upon the opinions mentioned. They might be enlarged, although not improved, and the conclusions arrived at further sustained by discussion, but this is not deemed necessary. It is thought proper, however, to say that the right of the adjacent owner to the advantages of a highway, whilst it is continued as such, do not appear to have been questioned. The absolute ownership even of the soil, though it be vested in the sovereign power, and revert to it when the highway is closed, does not destroy the right to the enjoyment suggested of light and air and access, and particularly as the long and uninterrupted user of the street has deprived (it may be) even the legislature of the State of the power of withdrawing it from that use. On that subject the remarks of Judge ANDREWS, in the case of *Mahady* v. *The Bushwick Railroad Company* (91 N. Y., 153), are appropriate, namely: "The plaintiff, though an abutting owner simply, the fee of the street being in the city, was entitled to the use of the street, and neither

the legislature nor the city could devote it to purposes inconsistent with street uses, without compensation, according to the principle of *Story* v. *The Elevated Railroad Company* (90 N. Y., 122), recently decided."

The case of *Dunham* v. *Williams* (37 N. Y., 251), is not in conflict with this suggestion, for the reason that there the claim was to the center of an abandoned road-bed, a claim to the *ownership* thereof. The highway, it was said in that case, was ancient and was laid out when New York was a province of the States general, and subject to the dominion and laws of the Dutch government, which did not permit any person to claim a present or reversionary title to the soil, for the reason that he was not the owner of the lands through which it was laid. Nor is it in conflict with anything decided in *Wetmore* v. *Story* (22 Barb., 440.)

Assuming, therefore, that the doctrines of the civil law were controlling and that the land or the soil of the highway belonged to the sovereign power and reverted to it when the highway was abandoned or closed, nevertheless, while open, the public, including, of course, the adjacent owners, were entitled to all the advantages secured by its existence. Some of these already suggested were light and air, which were recognized by the principles of the civil law as belonging so much in common to the whole society of mankind that no one person can make himself master of them, or deprive others of the use of them. (1 Strahan's Civil Law [translated from Domat], § 115.) And, further, that rivers, the banks of rivers and highways are things public, the use of which is common to all persons according to the respective laws of comities, the sovereign power regulating the use of them. (Id, § 116.) There are things common to every one (*res communes*), as air, flowing water, the open sea, the sea shore. These things were not appropriated even by the State. (Amos' History of the Civil Law of Rome, 124.) The adjacent owner gives a consideration for these benefits of light, air and access in the payment of the taxes imposed upon his land, and which are employed in part, at least, in meeting the expenses of the pavement of the street in front of his land and such repairs as are needed — taxes with which it is legally and properly burdened by municipal authority conferred by legislative action.

These benefits, thus paid for, could not, under any system of

government, less than a despotism, be denied to the adjacent owner. Nothing bearing directly upon this precise question, it is admitted, has been found in the doctrines of the civil law, though they may exist. It cannot be, however, that these rights can be swept away by the asserted supremacy of the sovereign power over the bed of a highway. This suggestion of the right to the enjoyment of the street, as such, while open, is predicate of the assumed domination of the civil law in this colony in earlier days, which was denied in a well-considered opinion, though a dissenting one, on the ground that neither Great Britain nor the colonial government ever claimed this province by right of conquest. It was claimed by right of discovery, not as a conquered country, and no part of the civil law except that which was derived from England has ever been in force in this colony. The guaranty to the Dutch settlers of the peaceable enjoyment of their possessions did not alter the nature of the British claim to the country. (*Canal Comrs.* v. *People,* 5 Wend., 445, opinion of the chancellor.)

The judgment should, for these reasons, be reversed and a new trial ordered, with costs to abide the event.

DANIELS, J., concurred.

Judgment reversed and new trial ordered, with costs to abide the event.